STATE OF NORTH CAROLINA EX REL UTILITIES COMMISSION, LEE TELE-
PHONE COMPANY (APPLICANT), AND COMMISSION STAFF (INTERVENOR),
APPELLEES v. ROBERT MORGAN, ATTORNEY GENERAL OF NORTH CAR-
OLINA (INTERVENOR IN BEHALF OF THE USING AND CONSUMING PUBLIC
OF NORTH CAROLINA), AND WALKERTOWN TELEPHONE EXCHANGE COM-
MITTEE (PROTESTANT), APPELLANTS

No. 10

(Filed 18 November 1970)

1. Utilities Commission § 1— regulation of utilities — responsibility for
poor service by utilities

A public utility which has been allowed to charge rates sufficient
to enable it to maintain its properties, in addition to earning a fair
return thereon, and which nevertheless permits its properties to fall
into such a poor state of maintenance as to impair the quality of its
service, must accept the responsibility for its resulting inability to
render adequate service to its patrons.

2. Utilities Commission § 1— duty of public utility

A public utility, having been granted a monopoly in its franchise
area, is under a duty to render reasonably adequate service. G.S. 62-42;
G.S. 62-131(b).

3. Telephone and Telegraph Companies § 1— responsibility of telephone
company for adequate service — effect of change in ownership

The identity of a telephone company seeking a rate increase was
not changed by the transfer of its stock from the former stockholders
to the present stockholders; nor could the change in stock ownership
enable the company to avoid the responsibility for its failure to main-
tain its plant and to render adequate service.

4. Utilities Commission § 1— statutory power and duties of the Commis-
sion

The clear purpose of Chapter 62 of the General Statutes is to
confer upon the Utilities Commission the power and the duty to compel
a public utility company to render adequate service and to fix therefor
reasonable rates pursuant to the procedure prescribed in G.S. 62-133.

5. Telephone and Telegraph Companies § 1; Utilities Commission § 6—
rate determination — effect of poor and substandard service by tele-
phone company

In determining rates for a telephone company pursuant to G.S.
62-133(b), the Utilities Commission is not required to shut its eyes
to "poor" and "substandard" service resulting from the company's
willful or negligent failure to maintain its properties or to heed com-
plaints from its subscribers; however, it does not follow that the
Commission is forbidden to grant any rate increase to a company
whose service is inadequate, even though the inadequacy be due to the
company's willful or negligent failure to perform its duty.

6. **Utilities Commission § 1— jurisdiction of the Commission**

The statutes confer upon the Utilities Commission, not upon the Supreme Court, the duty and authority to determine adequacy of service and reasonable rates therefor.

7. **Utilities Commission § 6— rate determination — consideration of inadequate service.**

Assuming adequate findings of fact, supported by competent and substantial evidence, the Utilities Commission, in the exercise of its sound administrative discretion, may lawfully conclude (1) that an increase in rates is warranted, notwithstanding existing service inadequacy due to the company's neglect of its properties, and (2) that such increase is an appropriate step in the improvement of the service. G.S. Ch. 62.

8. **Utilities Commission § 6— rate determination — ultimate question — consideration of inadequate service by utility**

The ultimate question for determination in a rate hearing is, What is a reasonable rate to be charged by the particular utility company for the service it proposes to render in the immediate future; serious inadequacy of such service is one of the facts which the Commission is required to take into account in making that determination. G.S. 62-133.

9. **Utilities Commission § 9— rate determination — review on appeal**

The determination of reasonable rates to be charged by a particular utility company may not be reversed by the Court of Appeals or by the Supreme Court merely because they would have reached a different conclusion on the evidence.

10. **Telephone and Telegraph Companies § 1; Utilities Commission §§ 6, 9— rate determination — poor service by telephone utility — effect on rate increase — findings of fact**

In a hearing on a telephone company's petition for authority to increase its rates for local service in this State, the order of the Utilities Commission granting some of the requested rate increase is reversed and remanded by the Supreme Court, where (1) the Commission stated in the order that it had considered the substandard quality of the company's existing service as an element bearing upon the company's permissible rate of return but (2) the Commission failed to make specific findings of fact showing what effect the substandard service had upon its decision to increase the company's rates.

11. **Telephone and Telegraph Companies § 1; Utilities Commission § 6— rate determination — fair value of company property — insufficiency of evidence**

In a hearing on a telephone company's petition for authority to increase its rates for local service in this State, the finding by the Utilities Commission as to the fair value of the company's properties at the end of the test period *is held* unsupported by substantial evidence in the record.

Utilities Comm. v. Morgan, Attorney General

12. Utilities Commission § 6— rate determination — what constitutes the rate base

In determining just and reasonable rates under G.S. 62-133, there is but one rate base—the fair value of the public utility's property used and useful in providing the service rendered to the public within the State, which value must be determined as of the end of the test period; it is incorrect to speak of "the original cost rate base" and the "trended original cost rate base."

13. Utilities Commission § 6— rate determination — fair return on properties

A public utility is not entitled to rates which will enable it to earn a fair return on either the original cost or the replacement cost, *per se.*

14. Telephone and Telegraph Companies § 1; Utilities Commission § 6— rate determination — present fair value of properties that were improperly maintained

Neither the original cost nor the reproduction cost may properly be taken as the present fair value of telephone properties which were improperly engineered, have not been properly maintained, and are consequently in need of extensive rehabilitation.

15. Telephone and Telegraph Companies § 1— rate determination — profits earned on sales to telephone utility — credit to net operating income

In determining the local rates to be charged by a telephone company which was owned by a parent holding company, the Utilities Commission was not required to credit to the telephone company's net operating income the profits earned on materials sold to the telephone company by a wholly owned subsidiary of the parent holding company.

16. Corporations § 1— corporate entity — circumvention of public policy

The doctrine of the corporate entity may not be used as a means for defeating the public interest and circumventing public policy; in order to prevent such a result, a parent corporation and its wholly owned subsidiaries may be treated as one.

17. Telephone and Telegraph Companies § 1; Utilities Commission § 6— rate determination — plant under construction — interest during construction

In determining the local rates for a telephone company, it was improper for the Utilities Commission (1) to include in the rate base the value of the company's telephone plant that was under construction at the end of the test period but which was not yet in operation and (2) to add the interest charged during construction to the company's operating income. G.S. 62-133(c).

18. Telephone and Telegraph Companies § 1; Utilities Commission § 6— rate determination — working capital requirements — advanced payments by customers

In determining the local rates for a telephone company, the amounts paid to the company by its customers as a result of the company's practice of billing the customers one month in advance was not creditable to the company's working capital requirements.

APPEAL by the Attorney General from the decision of the Court of Appeals, reported in 7 N.C. App. 576.

Lee Telephone Company, hereinafter called Lee, is a Virginia corporation which operates a general telephone business in Virginia and in North Carolina, approximately 21% of its telephones in service being in this State. It petitioned the Utilities Commission for authority to increase its rates for local telephone service in North Carolina, estimating that its proposed increases would produce additional gross revenues of approximately $240,000 annually. The Attorney General intervened on behalf of the public in opposition to the petition. The Walkertown Telephone Exchange Committee, composed of many subscribers to the company's service at its exchange in Walkertown, also intervened in opposition to the petition.

The Commission designated the proceeding a general rate case. Having received, from numerous subscribers to Lee's service at its various exchanges, complaints that the service is inadequate, the Commission consolidated for hearing those complaints and the petition of the company.

Voluminous evidence, consisting of both statistical exhibits and oral testimony, was introduced by the company and by the Commission's staff. Numerous witnesses for the complainants testified in detail concerning the quality of the service. Following the hearing, the Commission entered its order allowing the proposed rate increases in part, the resulting annual increase in the company's gross operating revenues being estimated to be $142,437. Commissioners Biggs and McDevitt dissented. Upon appeal by the Attorney General and the Walkertown Committee, the Court of Appeals affirmed the order of the Commission. From this decision, the Attorney General appealed to the Supreme Court.

The Attorney General contends: (1) No increase in rates should have been allowed in view of the inadequate service presently rendered by the company; (2) the Commission understated the company's net operating income by its failure to credit thereto profits derived by an affiliated company, Centel Service Company, from sales to Lee of equipment, materials and supplies; and (3) the Commission fixed the company's rate base in excess of the amount which should have been determined therefor.

Findings of fact and conclusions by the Commission, material to the appeal, summarized except as indicated, include the following (numbering by the Commission):

1. Central Telephone Company (actually, Central Telephone & Utilities Corporation) acquired a controlling interest in the capital stock of Lee in October 1965, and has operated it since that date.

6. The net investment in utility plant, used and useful in this State on May 31, 1968 (the end of the test period), is $4,158,121, which figure "reasonably represents the original cost rate base applicable."

7. "We find the trended original cost rate base to be $5,009,100."

8. The fair value of Lee's public utility property, used and useful in this State, is $4,500,000.

10. The annual gross operating revenues under the rates approved by the Commission will be $1,155,697.

11. The actual and reasonable operating expenses will be $430,044 annually.

12. The reasonable annual allowance for depreciation is $204,837.

13. Under the rates approved by the Commission, the annual tax liabilities of the company will be $244,037.

14. Under the rates approved by the Commission, the net operating income of the company will be $292,500.

17. Lee is earning 5.74% on its common equity, attributed to North Carolina operations, under its old rates. Under the rates approved by the Commission, it will earn 9.89% on its common equity.

18. Lee is earning a rate of return of 5.19% upon the fair value of its property under the old rates. Under those approved by the Commission, it will earn 6.50% on the fair value of its property.

19. A fair rate of return on the fair value of Lee's utility property is 6.50%.

21. "The quality of service rendered by Lee Telephone Company in this State is poor. In a measure, the

Company conceded the overall justification for these service complaints and stated its plans and intentions for improving its North Carolina facilities in the near future. The inadequate and poor quality telephone service offered by the applicant in this State relates to many factors such as the nature, size and extent of the territory served, the fact that the telephone facilities when acquired by Central Telephone Company in 1965 were engineered in such a way as to engender such service, the plant was inadequate and inefficient and therefore many of their problems were inherited upon purchase. However we find from the nature and extent of the complaints made and from statements and testimony of company representatives that the service being rendered by Lee is substandard, and that such grade of service reflects the failure of the Company to take those steps necessary for the improvement of toll service, local central office service, proper maintenance and the reduction of unsatisfactory multiparty main station service as is economically feasible, as well as its failure to eliminate traffic overloads on toll trunks, extended area service trunks and central office equipment groups, and its failure to take sufficient action to improve transmission and reduce noise levels."

22. "Centel Service Company is a wholly owned subsidiary of Central Telephone Company, which company is a subsidiary of Central Telephone and Utilities Corporation, as is Lee Telephone Company. * * * During the calendar year 1968 Lee's purchases for its North Carolina operations from Centel Service totalled $542,751 which generated a net profit to Centel in the amount of $39,621 * * * There is no evidence in this record relating to comparative prices from other supply outlets."

The order states that the Commission reached the following conclusions, summarized except as indicated, the numbering being that of the Commission:

3. "* * * We have considered the substandard quality of service being rendered by Lee as one element bearing upon the value of its utility investment and the rate it should be permitted to earn, along with other factors, including but not limited to, the nature, size and extent of the territory served, and the condition and level of its telephone facilities when acquired by Central Telephone Company in 1965. * * *"

4. "From the record in this case, we conclude that the telephone service being offered the public in North Carolina by Lee is inadequate and of poor quality particularly in the areas of toll service and local central office service. * * * One necessary factor in obtaining better service in the franchised area here involved is more abundant and improved equipment. The Commission has two courses of pursuit, it may either ignore the duty imposed upon it by statute to grant a fair rate of return and thereby starve the Company making it impossible for it to improve service, or it can take the approach, which we here adopt, for improved service by fixing just and reasonable rates under our statutory formula. * * *"

7. "That the Applicant should take action with all deliberate speed to provide adequate and sufficient telephone service to its subscribers within the rate structure herein found reasonable and approved. In the event that the Company should fail to provide substantial overall improvement in its service by December 31, 1970, and initiate and continue from this date to attainment of such adequate and sufficient telephone service, such action as is necessary, reasonable and proper in that connection, the Commission will consider such further action as is necessary to secure adequate and sufficient telephone service for the public living and being served in the area presently assigned to the Applicant."

14. "The level of profitability of the Centel Service Company on its purchasing and distribution of materials and supplies for its affiliate Lee Telephone Company requires that the Commission take notice of this type of relationship. * * * In the instant proceeding, the reasonableness of the level of prices charged and paid was not clearly demonstrated and no indepth study was made by the Commission Staff due to the fact that Centel Service Company had been in operation approximately one year at the time of the hearing. No adjustment is being made to the rate base or in the operating expenses due to these inter-company transactions, and the Commission is not approving or disapproving the level of profitability of the transactions between these two affiliates. We conclude it to be appropriate for this Commission to reserve for future consideration any need for investigation and possible adjustments which may properly arise therefrom in connec-

tion with the inter-affiliated company transactions."

In addition to the approval of a portion of the rate increases proposed by the company, the Commission ordered, "That the Company shall substantially improve telephone service in its franchised service area and implement plans for service improvements as filed with the Commission and as testified to in the hearing in this case."

*Attorney General Morgan, Deputy Attorney General Benoy and Maurice W. Horne, Special Assistant, for appellant.*

*Edward B. Hipp for appellee North Carolina Utilities Commission.*

*Burns, Long & Wood by Richard G. Long; Ross, Hardies, O'Keefe, Babcock, McDugald & Parsons by Melvin A. Hardies and Donald W. Glaves; and Duane T. Swanson for appellee Lee Telephone Company.*

LAKE, Justice.

In February 1965, this Court remanded to the Utilities Commission a proceeding instituted by Lee Telephone Company in 1963 for an increase in its rates for service in North Carolina. The Commission was directed to hold a further hearing in accordance with G.S. 62-133 and the opinion of this Court. *Utilities Commission v. Telephone Co.,* 263 N.C. 702, 140 S.E. 2d 319. It is presumed that, pursuant to such direction, the Utilities Commission then fixed rates which were fair and reasonable in view of conditions then prevailing. Such rates would, necessarily, include adequate allowances of maintenance and for depreciation of the company's properties and would provide a return upon the fair value of those properties sufficient to enable the company to attract capital for necessary expansion of its plant.

The petition filed with the Commission in the present proceeding states that on 6 June 1968 the Commission granted a further rate increase to Lee. No appeal having been taken therefrom, it is presumed that the rates then fixed were, in the light of conditions then prevailing, fair and reasonable, yielding to the company a return upon the fair value of its properties sufficient to attract capital, under then prevailing conditions, after making adequate provision for maintenance and depreciation of its properties. G.S. 62-132. Four months there-

Utilities Comm. v. Morgan, Attorney General

after the company filed with the Commission its petition in the present matter.

In this proceeding the Commission has found that the company's service is "poor" and "substandard," and that this condition "reflects the failure of the company to take those steps necessary for the improvement of toll service, local central office service, *proper maintenance* and the reduction of unsatisfactory multiparty main station service as is economically feasible, as well as its failure to eliminate traffic overloads on toll trunks, extended area service trunks and central office equipment groups, and its failure to take sufficient action to improve transmission and reduce noise levels." (Emphasis added.)

[1, 2] A public utility, which has been allowed to charge rates sufficient to enable it to maintain its properties, in addition to the earning of a fair return thereon, and which nevertheless permits its properties to fall into such a poor state of maintenance as to impair the quality of its service, must accept the responsibility for its resulting inability to render adequate service to its patrons. Having been granted a monopoly in its franchise area, the utility is under a duty to render reasonably adequate service. G.S. 62-131(b) ; G.S. 62-42.

[3] The identity of Lee Telephone Company was not changed by the transfer of its stock in 1965 from the former stockholders to Central Telephone & Utilities Corporation (erroneously designated by the Commission as Central Telephone Company, the name of another subsidiary of Central Telephone & Utilities Corporation). Lee's responsibility for its failure to maintain its plant, and for the resulting impairment of its ability to render adequate service, is not avoided by the change in stock ownership. The condition of the telephone plant and the resulting quality of service rendered is not, as the Commission called it, an "inherited problem" of the new stockholder. It is a condition acquired by purchase. Lee's brief states that when the new stockholder acquired control of Lee, "following four years of litigation, Lee's plant margins were virtually exhausted." It is not contended that the new stockholder was unaware of this circumstance when it purchased the controlling interest in Lee or when, as shown in its brief, it subsequently increased its ownership to 99.8% of the outstanding common stock.

Lee's brief states that the new stockholder immediately began "an extensive *rehabilitation*, expansion and service im-

provement program." (Emphasis added.) There is nothing to indicate that the new stockholder was not aware of the neglect of maintenance of the properties during the extended litigation related to its acquisition of the stock. The record is replete with testimony by subscribers to the service to the effect that, since 1965, the service has been grossly inadequate and characterized by marked indifference to complaints from subscribers. The Commission has found, in July 1969, that it is still "poor" and "substandard." Nevertheless, the Commission approved, over the vigorous dissent of two of its members, another substantial increase in the rates which the subscribers must pay for this service. The dissenting Commissioners state that the rates so approved for the "substandard" service are "the highest general telephone exchange rates in the State of North Carolina."

The Attorney General contends that if the "substandard" quality of the service is the result of inefficient management, as distinct from inability to attract capital, no rate increase should have been allowed by the Commission. Lee contends that the Commission may not lawfully refuse to approve rates which would yield to it a fair return on the fair value of its properties, regardless of the quality of its service. The Utilities Commission contends that the allowance of a rate increase, otherwise justifiable, is within its discretion, though the service be of substandard quality. To resolve this question, which has not previously been before this Court, we turn to the statutes governing the regulation of public utility rates. G.S., c. 62.

G.S. 62-133 sets forth in detail the steps to be taken by the Commission in fixing rates to be charged by a public utility in this State. Paragraph (b) provides that in fixing such rates the Commission *shall* do the following things: (1) Ascertain the fair value of the property used and useful in providing the service; (2) estimate the revenue to be received under the present and the proposed rates; (3) ascertain the utility's reasonable operating expenses, including depreciation; (4) fix the rate of return on the fair value of the property such as will enable the utility, by sound management, to produce a fair profit for its stockholders, to maintain its facilities, and to compete in the market for capital on reasonable terms; and (5) fix rates to be charged for the utility's services such as will earn such return in addition to reasonable operating expenses. If this paragraph stood alone, there would seem to be merit in the contention of the company. It does not, however, stand alone.

Utilities Comm. v. Morgan, Attorney General

Paragraph (a) of G.S. 62-133 provides that in fixing rates "the Commission shall fix such rates as shall be fair both to the public utility and to the consumer." Paragraph (d) of this section provides, "The Commission shall consider all other material facts of record that will enable it to determine what are reasonable and just rates."

G.S. 62-2 declares the policy of the State, which it is the purpose of the entire chapter to put into effect, as follows:

> "*Declaration of Policy.*—Upon investigation it has been determined that the rates, services and operations of public utilities * * * are affected with a public interest and it is hereby declared to be the policy of the State of North Carolina to provide fair regulation of public utilities in the interest of the public, to promote the inherent advantages of regulated public utilities, *to promote adequate, economical and efficient utility services* to all of the citizens and residents of the State, to provide just and reasonable rates and charges for public utility services without unjust discrimination * * * and to these ends, to vest authority in the Utilities Commission to regulate public utilities generally and their rates, services, and operations, in the manner and in accordance with the policies set forth in this chapter." (Emphasis added.)

G.S. 62-32 confers upon the Commission general supervision over the rates charged and services rendered by all public utilities in this State and vests in the Commission "all power necessary to require and compel any public utility to provide and furnish to the citizens of this State reasonable service of the kind it undertakes to furnish and fix and regulate the reasonable rates and charges to be made for such service."

G.S. 62-42 provides that whenever the Commission, after notice and hearing, finds that the service of any public utility is inadequate, the Commission shall enter an order directing that "additions, extensions, repairs, improvements, or additional services or changes shall be made or affected [sic] within a reasonable time prescribed in the order."

G.S. 62-131 reads as follows:

> "*Rates must be just and reasonable; service efficient.*— (a) Every rate made, demanded or received by any public utility, or by any two or more public utilities jointly, shall be just and reasonable.

"(b)  Every public utility shall furnish adequate, efficient and reasonable service."

[4]  The clear purpose of chapter 62 of the General Statutes is to confer upon the Utilities Commission the power and the duty to compel a public utility company to render adequate service and to fix therefor reasonable rates pursuant to the procedure prescribed in G.S. 62-133.

[5]  It is not reasonable to construe G.S. 62-133(b) to require the Commission to shut its eyes to "poor" and "substandard" service resulting from a company's wilful, or negligent, failure to maintain its properties or to heed complaints from its subscribers when the Commission is called upon by the company to permit it to increase its rates for its inadequate service. We reject the contention of the company upon this question.

[5-7]  It does not follow, however, that the Commission is forbidden to grant any rate increase to a company whose service is inadequate, even though the inadequacy be due to a wilful, or negligent, failure by the company to perform its duty. The statutes confer upon the Commission, not upon this Court, the duty and authority to determine adequacy of service and reasonable rates therefor. *Utilities Commission v. Telephone Co.,* 266 N.C. 450, 146 S.E. 2d 487; *Utilities Commission v. Champion Papers, Inc.,* 259 N.C. 449, 130 S.E. 2d 890; *Utilities Commission v. State and Utilities Commission v. Telegraph Co.,* 239 N.C. 333, 80 S.E. 2d 133. The authority of the Court of Appeals and of this Court in reviewing an order of the Utilities Commission is limited to that conferred by G.S. 62-94. Assuming adequate findings of fact, supported by competent, substantial evidence, we find nothing in the provisions of chapter 62 of the General Statutes which makes it unlawful for the Commission, in the exercise of its sound administrative discretion, to conclude that an increase in rates is warranted, notwithstanding existing service inadequacy due to the company's neglect of its properties, and that such increase is an appropriate step in the improvement of the service. This appears to be the prevailing view in other states. See: *Baltimore Transit Co. v. Public Service Commission of Maryland,* 206 Md. 533, 112 A 2d 687; *City of Lexington v. Public Service Commission of Kentucky,* 249 S.W. 2d 760 (Ky.) ; *Village of Apple River v. Illinois Commerce Commission,* 18 Ill. 2d 518, 165 N.E. 2d 329.

**[8, 9]** There are infinite degrees of inadequate service and many differences in the causes of such deficiencies. The ultimate question for determination is, What is a reasonable rate to be charged by the particular utility company for the service it proposes to render in the immediate future? The determination of this question is for the Commission, in accordance with the direction of G.S. 62-133. Serious inadequacy of such service, found by the Commission upon substantial evidence, is one of the facts which the Commission is required by that statute to take into account in making that determination. The Commission's determination, reached pursuant to the mandate of G.S. 62-133 and to the statutory procedural requirements, may not be reversed by the Court of Appeals or by us merely because we would have reached a different conclusion upon the evidence.

It is otherwise if it does not appear from the order of the Commission that these statutory mandates have been obeyed. In *Utilities Commission v. Public Service Co.,* 257 N.C. 233, 125 S.E. 2d 457, the Commission, in fixing the rate base of a public utility, said, "In so finding we have considered all factors required by G.S. 62-124 [the predecessor to the present G.S. 62-133] and all other facts which we feel have a bearing upon our conclusion—without reference to specific formula." This Court, reversing the Commission, said:

> "The statute gives the Commission the right to consider *all other facts* that will enable it to determine what are reasonable and just rates. The right to consider 'all other facts' is not a grant to roam at large in an unfenced field. The Legislature properly understood that, at times, other facts may exist, bearing on value and rates, which the Commission should take into account in addition to those specifically detailed in G.S. 62-124. However, it was contemplated that such facts be established by evidence, be found by the Commission, and be set forth in the record to the end the utility may have them reviewed by the courts."

In this respect it is, of course, immaterial whether the party seeking judicial review be the utility or its adversary. In the present case, the Commission has said in its order:

> "The statutory rate-making formula is controlling in this matter. We have considered the substandard quality of service being rendered by Lee as one element bearing

upon the value of its utility investment and the rate it should be permitted to earn * * *."

[10] The Commission then stated that the company had made progress in improving its service and the Commission was taking the approach of procuring continued improvement by "fixing just and reasonable rates under our statutory formula." We are unable to determine from the record what specific effect the Commission gave to the poor quality of the existing service in reaching its conclusion that some but not all of the requested rate increase should be allowed. The order does not indicate what increase in rates would have been approved had the service been found adequate. The findings, conclusions and order of the Commission do not, therefore, disclose that in this respect the Commission acted arbitrarily or that its conclusion is in excess of its statutory authority or is affected by an error of law, nor do they disclose the contrary.

[11] We turn now to see how the Commission proceeded in "fixing just and reasonable rates under our statutory formula." It determined what it designates as "the original cost rate base applicable," which it fixed at $4,158,121 as of the end of the test period. It then found the "trended original cost rate base" to be $5,009,100. It then found the fair value of the company's property to be $4,500,000.

[12] We note, in passing, the error of terminology. It is incorrect to speak of "the original cost rate base" and the "trended original cost rate base." See *Utilities Commission v. State and Utilities Commission v. Telegraph Co., supra.* There is but one rate base—the fair value of the public utility's property used and useful in providing the service rendered to the public within this State, which value the Commission must determine as of the end of the test period. G.S. 62-133. The original cost of the properties is simply evidence to be considered in making this determination. The replacement cost, whether determined by use of trended cost indices or otherwise, is also but evidence of the fair value of the properties.

[13] A public utility is not entitled to rates which will enable it to earn a fair return on either the original cost or the replacement cost, *per se.* "Although the sense in which the courts use the phrase 'fair value' is less definite than it should be, it seems clear that the term does not cover money stupidly, extravagantly, or corruptly spent. If a utility has been seriously

overbuilt, or its promoters have been seriously overpaid, the law does not intend that its customers shall be saddled with the payment of interest on the money thrown away." Edgerton, Value of Service as a Factor in Rate Making, 32 Harvard L. Rev. 516.

[14] In the present case, the Commission has found as facts that the properties owned by Lee prior to the acquisition of its stock by the present stockholder "were engineered in such a way as to engender [the inadequate] service," that "the plant was inadequate and inefficient" and the company had failed to maintain it properly. The brief filed by Lee in this Court states that following such stock acquisition the company embarked upon a program for "extensive rehabilitation." Neither the original cost nor the reproduction cost may properly be taken as the present fair value of telephone properties which were improperly engineered, have not been properly maintained and, consequently, are in need of extensive rehabilitation.

The testimony of Lee's vice president shows that, from the date of acquisition of control of Lee by Central Telephone & Utilities Corporation to the end of the test period used by the Commission, Lee made "gross additions" to its plant in the amount of $1,859,000. Of this amount, $709,000 was added during the last five months of the test period. Obviously, the replacement cost at the end of the test period of these "gross additions" to plant, less normal depreciation, would be little, if any, more than the original cost thereof.

The Commission found that at the end of the test period the company's "gross plant and plant under construction" (actual investment, with no deduction for depreciation and exclusive of working capital) was $5,312,766. Subtracting the "gross additions" made from the stock transfer to the end of the test period, it is apparent that the undepreciated original investment in the poorly engineered, poorly maintained properties owned prior to the stock transfer and still in service at the end of the test period was $3,453,766. The Commission found that the "applicable depreciation reserve," virtually all of which would, in the nature of things, be attributed to the older properties, was $1,245,088. The depreciation reserve is, of course, accumulated on the basis of the normal life of properties, assuming normal maintenance and with no allowance for inadequate engineering. Attributing only $1,000,000 of this depreciation reserve to the older properties, the company's net investment

therein at the end of the test period would not have exceeded $2,453,766.

The Commission's finding of $5,009,100 as the "trended original cost" of the entire properties obviously includes an allowance of $90,443 for working capital, leaving $4,918,657 as its computation of the "trended original cost" of the entire plant, less depreciation. Substracting from this figure, the entire "gross additions" made from the time of the stock transfer to the end of the test period, it is clear that the Commission must have estimated the "trended original cost" (less depreciation) of the poorly engineered, poorly maintained property to have been at least $3,059,657 at the end of the test period. Of course, neither the actual depreciation reserve on the company's books nor the "trended depreciation reserve" used by the Commission in these computations reflects any of the abnormal depreciation due to the poor engineering or the poor maintenance. Thus the Commission's computation of the "trended original cost," depreciated, of these poorly engineered, poorly maintained properties was at least $605,891 in excess of their actual original cost less the reserve for normal depreciation.

[11] The Commission's final conclusion was that the fair value of the total properties used and useful in providing the service was $4,500,000. This includes its allowance of $90,443 for working capital, leaving $4,409,557 as the "fair value" of the telephone plant. Again, subtracting from this figure the entire $1,859,000 of "gross·additions" from the stock acquisition to the end of the test period, we have a remainder of $2,550,557 allowed by the Commission in the rate base as the fair value of the poorly engineered, poorly maintained properties said by the company itself to be in need of extensive rehabilitation. The full actual cost of these properties, less only normal depreciation was, as above shown, not in excess of $2,453,766. In view of the evidence and the Commission's findings as to the condition of these properties, the Commission's finding as to the fair value of the company's properties at the end of the test period must be deemed unsupported by substantial evidence in the record.

[15] The Commission found that during the calendar year 1968 Lee Telephone Company purchased materials, supplies and equipment from Centel Service Company. Centel is a wholly owned subsidiary of Central Telephone Company. Central Telephone Company is, in turn, a subsidiary of Central Telephone

& Utilities Corporation, the owner of 99.8% of the common stock of Lee Telephone Company. The Commission found that upon Lee's purchases, for its North Carolina operations, from Centel in the calendar year 1968 Centel derived a profit of $39,621. The test period used by the Commission in this proceeding, however, was the twelve months ending May 31, 1968. There is no finding by the Commission concerning sales by Centel to Lee during the test period, and no evidence from which such finding could be made. The Commission's finding with reference to the transactions between Lee and Centel is, therefore, meaningless so far as the reasonableness of the rates established by the Commission's order is concerned.

The Commission found that Centel was incorporated in June 1967. Thus it was in existence throughout all or substantially all of the test period. Centel manufactures nothing. Its sole function is to purchase materials, supplies and equipment for resale to operating companies within the Central Telephone system. According to Lee's brief, Centel's pricing policy is to sell to the operating companies at prices comparable to those which would be paid if the same materials were purchased through other distributors. The record shows Centel's total paid in capital is $1,000. In 1968, the first full calendar year of its existence, Centel paid to its single stockholder dividends of $971,964 and at the end of 1968 had a surplus of $112,958.

The Attorney General contends that the profits made by Centel on its sales in 1968 to Lee Telephone Company for its North Carolina operations, $39,621, should have been credited by the Commission to Lee's net operating income, from its North Carolina operations in the test period, for rate making purposes. If this were done, a smaller rate increase than that allowed would be required to produce the net operating income necessary to constitute a fair return upon the fair value of the company's properties as found by the Commission. The theory of the Attorney General's argument is that the prices paid by Lee for the materials, supplies and equipment purchased are reflected in its statement of its operating expenses for the test period and, therefore, the operating expenses are overstated by the amount of $39,621, with the result that the net operating income is understated by that amount.

In the instant case, the contention of the Attorney General must fail for two reasons. *First,* only those purchases for operating materials and supplies, including current maintenance,

are chargeable to operating expense. The purchases for plant construction go into the account for investment in plant, not to operating expense. An overcharge, if any, to investment in plant does not affect the net operating income. While such overcharge would improperly add to the account for original cost of the plant, which is an item to be considered in computing the rate base, it actually would not affect the rate base directly, since the rate base is the fair value of the plant, not the cost of it. There is in this record no evidence whatever to support a finding as to how much of the profit derived by Centel from its sales to Lee, for North Carolina operations, was made on purchases for use as operating supplies, including current maintenance, and how much was made on purchases for additions to plant. *Second,* the evidence in the record relates to profits made by Centel on Lee's purchases from it in the calendar year 1968. There is no finding, and no evidence in the record which would support a finding, as to Centel's profits on sales to Lee during the test period.

[16]  It is well established that the doctrine of the corporate entity may not be used as a means for defeating the public interest and circumventing public policy. *Henderson v. Finance Co.,* 273 N.C. 253, 260, 160 S.E. 2d 39; *Estridge v. Denson,* 270 N.C. 556, 565, 155 S.E. 2d 190; *Terrace, Inc. v. Indemnity Co.,* 243 N.C. 595, 598, 91 S.E. 2d 584. In order to prevent such a result, a parent corporation and its wholly owned subsidiaries may be treated as one. Obviously, an operating telephone company may not justify its application for a rate increase by showing on its books expenditures for materials and supplies in excess of the amount actually paid therefor. For example, Lee Telephone Company, when operating independently, might have purchased certain items in large quantity because of its combined operations in North Carolina and Virginia. Having done so, it could not charge its North Carolina operations with a higher price for such materials than it actually paid therefor, irrespective of the fact that the price so charged might be no higher than would have been paid if the small volume, purchased for use in North Carolina alone, had been purchased separately. In the present case, we refrain from expressing an opinion as to whether a parent company, operating numerous wholly owned subsidiary telephone companies, may establish an additional wholly owned subsidiary to purchase materials in large quantities at favorable prices, due to volume, and then resell to its operating subsidiaries at a higher price and thus enhance the

operating expenses of the subsidiary companies for their respective rate making purposes. Upon the present record, that question is not presented and it was not determined by the Commission or by the Court of Appeals.

[17]   The Commission included in the rate base property under construction at the end of the test period in the amount of $318,052. Obviously, such property did not produce any operating income during the test period. As an offsetting adjustment, the Commission added to the company's operating revenue for the test period interest charged to construction during the test period. This is a practice which the Commission has followed for many years. It is commonly accepted in utility rate making. See: *Petition of New England Telephone & Telegraph Co.*, 115 Vt. 494, 66 A 2d 135; *City of Lynchburg v. Chesapeake & Potomac Telephone Company*, 200 Va. 706, 107 S.E. 2d 462. While not the exact equivalent, the addition to the company's operating income during the test period of interest charged to construction is an approximation of the income reasonably to be expected from the properties under construction when placed in service. Nevertheless, this practice cannot be followed in view of G.S. 62-133 (c) which reads as follows:

> "(c)   The public utility's property and its fair value shall be determined as of the end of the test period used in the hearing and the probable future revenues and expenses shall be based on the plant and equipment *in operation at that time*." (Emphasis added.)

Thus the plant under construction at the end of the test period should not have been included in the rate base and the item of interest during construction should not have been added to the company's operating income during the test period. The result of correcting these offsetting errors will be minimal and would not, alone, justify a remand of the matter to the Commission for further consideration. G.S. 62-94 (c) provides that upon appeal from an order of the Commission due account shall be taken of the rule of prejudicial error.

[18]   We find no merit in the Attorney General's contention that the Commission erred in its computation of the addition to the rate base for working capital. The basis of the contention is that the company bills its customers for local services for one month in advance. It is true that where the customers of a public utility, in the payment of their bills, provide the com-

pany with funds in order to enable it to meet expenses, which it will not have to pay until some time in the future, those funds, being available to the company for working capital, are to be credited to its need therefor. The rate base should include working capital supplied by the company but not funds supplied by its customers. *Utilities Commission v. State and Utilities Commission v. Telegraph Co., supra.* This principle is not, however, applicable to the present case. While the company bills its customers for local service one month in advance, the record does not show when these bills are actually paid so as to place the money in the hands of the company for use. The Attorney General estimates that they are paid not later than the middle of the month. If so, by the time of payment, half of the month's service has been rendered. Thus the effect is the same as if payment for the service were made as it is rendered and there is no substantial accumulation of funds in the hands of the company for the payment of expenses at some future time.

The Commission said in its order that it had considered the substandard quality of the service being rendered by Lee as an element bearing upon the value of its property and upon the rate of return it should be permitted to earn thereon. Nothing in its order indicates the effect given thereto by the Commission. The order does not show wherein, or the extent to which, the determination of the fair value of the properties or of the rates for service are different from what they would have been had the service been excellent and had the properties been in a high state of efficiency and maintenance.

Under the unusual circumstances of this case, the Commission should make specific findings showing the effect upon its decision of the inadequacy it found in the service and the deficiencies it found in the engineering and maintenance of the properties. The Commission may not lawfully "ignore the duty imposed upon it by statute," as suggested in its order, by reason of the company's poor service, nor does it discharge that duty by a mere statement that it has considered the matter, without showing the effect given to it. Such finding or conclusion is necessary to enable a reviewing court to determine whether the duty imposed by statute has been performed.

The judgment of the Court of Appeals which affirmed the order of the Commission is reversed, and the matter is remanded to that Court with direction that it enter a judgment reversing the order of the Utilities Commission and remanding the matter

to it for further consideration in accordance with this opinion upon the present record or after such further hearing as the Commission shall deem proper.

Reversed and remanded.