263 S.E.2d 583 (1980)
STATE of North Carolina ex rel. UTILITIES COMMISSION; Nantahala Power & Light Company, Applicants-Appellants,
v.
Rufus L. EDMISTEN, Attorney General et al.; Intervenors-Appellees.
No. 80.
Supreme Court of North Carolina.
March 5, 1980.
*585 Rufus L. Edmisten, Atty. Gen., by Richard L. Griffin, Asst. Atty. Gen., Maurice W. Horne, Deputy Gen. Counsel, Raleigh, for the State.
Joyner & Howison, by Robert C. Howison, Jr., James E. Tucker and G. Clark Crampton, Raleigh, for Nantahala Power and Light Co.
Crisp, Smith & Davis, by William T. Crisp, Raleigh, and Spiegel & McDiarmid, by Robert H. Bear, Washington, D. C., for Henry J. Truett.
McKeever, Edwards, Davis & Hays, by Fred H. Moody, Jr., Bryson City, for County of Swain.
Joseph Pachnowski, Bryson City, for Town of Bryson City.
EXUM, Justice.
On 1 November 1976, Nantahala Power and Light Company (Nantahala) applied to the North Carolina Utilities Commission for permission to raise its retail electric utility rates and to revise a purchased power cost adjustment clause applicable to such rates. Treating the matter as an application for a general rate increase under G.S. 62-133, the Commission ordered investigation, posting of notices, and held public hearings. The Attorney General on behalf of the consuming public of North Carolina, the Town of Bryson City, the County of Swain, and Henry J. Truett were allowed to intervene in the proceedings.
During the hearings, intervenors moved (a) for an order by the Commission joining as parties respondent Aluminum Company of America (Alcoa) and Tapoco, Inc. (Tapoco), and (b) for an order by the Commission compelling Nantahala to produce information sufficient to allow the Commission to consider a rate design based on the "rolling in" of Tapoco's properties, revenues, and expenses with those of Nantahala, as though the two were operating as one utility. Both motions were denied, and the Commission subsequently authorized certain increases in Nantahala's rates and purchased power adjustment clause. The Court of Appeals reversed, vacating the order authorizing the rate increase and remanding the case to the Commission for the purposes of making Tapoco a party and considering "whether the people of North Carolina would benefit by use of the roll-in method of rate making involving Nantahala *586 and Tapoco." 40 N.C.App. at 120, 252 S.E.2d at 522. On 12 April 1979, the Court granted Nantahala's petition for a writ of supersedeas to stay the mandate of the Court of Appeals and permit the continuation of the new rates authorized by the Commission.
For the reasons set out below, we affirm the decision of the Court of Appeals only insofar as it directs the Commission to consider whether a rate schedule computed as if Nantahala and Tapoco were one utility would be in the best interests of the customers of Nantahala. We leave to the discretion of the Commission the choice of the procedure whereby it will obtain the information necessary for the roll-in computation. We reverse that part of the Court of Appeals' decision which vacates the Commission's order authorizing the increased rate schedule, and we dissolve our writ of supersedeas. Although the 1977 rates will be allowed to continue in effect, we direct the Commission to require Nantahala to insure its ability to refund any excess premiums that may be found to have been charged upon final determination of the rate schedule proper to this case.
The somewhat intricate factual background of this case is not generally in dispute. Incorporated in North Carolina in 1929, Nantahala is a wholly owned subsidiary of Alcoa. It owns and operates hydroelectric generation and transmission facilities in the western part of this state and serves the public in six western counties with retail electrical service. For many years, a large percentage of Nantahala's total kilowatt hour production was transferred to Alcoa's facilities in Tennessee. With the population growth of western North Carolina after 1960, however, an increasing proportion of Nantahala's production has been required to satisfy its public service utility load. Indeed, since 1971 Nantahala has not directly transferred any of its electrical output to Alcoa.
Tapoco was incorporated in 1900 in Tennessee as Knoxville Power Company. It was domesticated in North Carolina in 1954. In 1955 Tapoco, along with Nantahala and Carolina Aluminum Co., jointly filed with the North Carolina Utilities Commission for a certificate of public convenience and necessity to permit Tapoco to acquire and operate two electrical generation facilities at Santeetlah and Cheoah then owned by Carolina Aluminum. In the order granting the certificate, the Commission directed that Tapoco supply to Nantahala the power necessary to satisfy Nantahala's public service loads in the two villages of Santeetlah and Tapoco in Graham County. This certificate is still in effect. Tapoco is a wholly owned subsidiary of Alcoa.
The transmission facilities of Nantahala and Tapoco are integrated and interconnected into a single system. Alcoa controls the ultimate operation and accounting policies of both utilities. The chief executive officers of both Nantahala and Tapoco report directly to an Alcoa vice president. Members of the board of directors of both utilities are employees of Alcoa.
In 1941 Alcoa entered into a twenty-year agreement with the Tennessee Valley Authority (TVA), pursuant to which Alcoa caused Nantahala (not a party to the agreement) to transfer to TVA a large part of Nantahala's real property holdings. The property so transferred was valued at approximately 3.5 million dollars and was eventually used in the construction of TVA's Fontana Dam. In return for the transfer, TVA agreed to supply Alcoa a continuous stream of 11,000 kw for the term of the contract. During the period of this contract, Nantahala produced electricity in excess of its public service load. This excess was sold to Alcoa at "dump" prices.
Effective 1 January 1963, the 1941 agreement was modified and largely replaced by the "New Fontana Agreement," to which Nantahala, Alcoa, Tapoco, and TVA are parties. This agreement allows TVA to coordinate Tapoco's operations and most of Nantahala's in such a way as to integrate into a single system the two utilities' electrical production and distribution. Instead of supplying Alcoa with electricity, TVA receives all of the electrical output of the Tapoco and Nantahala plants (except that *587 of three small facilities belonging to Nantahala) and grants to Nantahala and Tapoco in return average annual entitlements to some 1,798,000,000 kwh (average power of 205.1 mw.). The agreement specifies that Alcoa, Nantahala, and Tapoco are to decide among themselves how these entitlements will be allocated and distributed.
A subsequent apportionment agreement in 1963 provided that Nantahala was to receive as its monthly share of the New Fontana Agreement entitlements the larger of either its total actual generation output or one-twelfth of its annual primary energy capability of 360 million kwh.[1] This apportionment agreement further provided that Alcoa was to pay Nantahala an annual sum of $89,200 in compensation for allowing TVA to control Nantahala's facilities.
In 1971, however, the 1963 apportionment formula was superseded by new agreements between Tapoco, TVA, and Nantahala. Under these 1971 agreements, which are now in effect, Nantahala's share of the TVA entitlements is limited to 360 million kwh annually, an amount of energy equal to Nantahala's primary capability. Any additional energy needed by Nantahala to satisfy its public service load is to be purchased from TVA. Additionally, Nantahala is to pay TVA a charge if the demand of its system exceeds 54,300 kw at any instant. These agreements eliminate the annual $89,200 payment by Alcoa to Nantahala. The remainder of the energy returned by TVA under the New Fontana Agreement entitlements goes to Tapoco, which then transfers it to Alcoa.
The intervenors in this case contend that the facts and circumstances attendant to Nantahala's relationship with Tapoco and Alcoa are such as to compel the Commission at least to consider the propriety of a rate schedule computed upon a rate base which takes into account the property values and operating expenses of both Tapoco and Nantahala. They assert that such a roll-in method of rate making will serve to cancel, or at least to "true up," concealed benefits which allegedly flow to Alcoa from Nantahala and Tapoco by virtue of the 1971 agreements. The Commission on the other hand concluded in its order that the evidence is not sufficient to warrant the treatment of Nantahala and Tapoco as a single entity, or to disregard the separate corporate identities of Nantahala, Tapoco, and Alcoa. The Court of Appeals disagreed. We agree with the Court of Appeals.
Chapter 62 of the General Statutes confers upon the Commission both the power and the duty to compel a public utility to render adequate service to its public customers in return for reasonable rates. Utilities Commission v. Morgan, 277 N.C. 255, 177 S.E.2d 405 (1970). These rates are to be fixed by the Commission as low as may be reasonably consistent with due process requirements of the state and federal constitutions. Utilities Commission v. Duke Power Co., 285 N.C. 377, 206 S.E.2d 269 (1974). In the setting of such rates, the Commission is required to consider not only those specific indicia of a utility's economic status set out in G.S. 62-133(b),[2] but also *588 "all other material facts of record" which may have a significant bearing on the determination of reasonable and just rates. G.S. 62-133(d); Utilities Commission v. Edmisten, 291 N.C. 327, 230 S.E.2d 651 (1976). Although it is not for an appellate court to dictate to the Commission what weight it should give to material facts before it, a summary disposition which indicates that the Commission accorded only minimal consideration to competent evidence constitutes error at law and is correctable on appeal. Utilities Commission v. Gas Co., 254 N.C. 536, 119 S.E.2d 469 (1961); G.S. 62-94.[3]
As a public utility, Nantahala's primary duty is to serve its public customers. These customers have, in effect, "first claim" on all energy actually generated by Nantahala's facilities. Utilities Commission v. Membership Corporation, 260 N.C. 59, 131 S.E.2d 865 (1963). Nantahala may not be allowed to structure its economic affairs or physical operations in such a way as to effect an unreasonable preference or advantage to anyone, including its parent Alcoa. Utilities Commission v. Mead Corporation, 238 N.C. 451, 78 S.E.2d 290 (1953); G.S. 62-140. To the degree, then, that the record in the instant case reveals facts which support an inference that Nantahala's relationship with Tapoco and Alcoa adversely affects Nantahala's service to its North Carolina customers, the circumstances of that relationship are material and must be scrutinized closely by the Commission in the course of its rate making proceedings. The doctrine of corporate entity should not stand as a shield to such an inquiry. See, e. g., Utilities Commission v. Morgan, supra, 277 N.C. at 272-73, 177 S.E.2d at 416.
From uncontradicted statements in the record of witnesses who testified on behalf of Nantahala, it is clear that all of Nantahala's actual electrical output (except that of three small facilities not included in the New Fontana Agreement) "immediately becomes TVA's source" and is distributed pursuant to the New Fontana and 1971 apportionment agreements. Similarly, all the power that Tapoco produces is absorbed by TVA into the same integrated system. In return, Nantahala and Tapoco together receive from TVA a block entitlement of an annual average of over 1.79 billion kwh. Of this amount, Nantahala is apportioned some 360 million kwh annually, or 30 million kwh monthly, to meet its public service load. When Nantahala's public service demands exceed this apportionment, it must purchase additional energy from TVA to meet its requirements. The cost of such additional power is passed on to Nantahala's retail customers via monthly purchased power cost adjustments to their electric utility bills. Tapoco receives the remainder of the New Fontana entitlements from TVA and "sells" the bulk of these directly to Alcoa. It is undisputed that the amount which Alcoa pays to Tapoco for this power does not reflect the actual value of the energy transferred.[4]
*589 Evidence in the record further shows that Nantahala has not directly sold electricity to Alcoa since 1970. Since 1971, moreover, Nantahala's New Fontana Agreement entitlement to 360 million kwh per year has generally been insufficient to meet the demands of its public customers. During the test year 1975, for example, the Nantahala system load requirement was slightly in excess of 450 million kwh. The cost of additional power purchased that year by Nantahala from TVA was over $1.5 million, an amount presumably passed on at least in part to Nantahala's customers through monthly billing adjustments. During that same year, however, the Nantahala system generated in excess of 520 million kwh. These figures support the strong inference, if not the inescapable conclusion, that Nantahala's 1975 purchases of additional power from TVA were often required not by actual need, but merely by virtue of the 360 million kwh allocation ceiling imposed by the 1971 apportionment agreements.[5]
In support of its order authorizing Nantahala's rate increase, the Commission concluded inter alia that the New Fontana and 1971 apportionment agreements were just and reasonable and to the benefit of Nantahala's customers. It is true that the effect of these agreements is to ensure to Nantahala, and thus to its customers, the continued availability of 360 million kwh of "firm" uninterruptible power annually, whether or not Nantahala's system actually produces that amount of energy on its own. This 360 million kwh entitlement, however, is based upon Nantahala's primary energy capability, i. e., that amount of energy the Nantahala system could theoretically produce in a year under the most critical drought conditions of low rainfall and stream flow.[6] The entitlement figure is not derived "from the average amount of energy [Nantahala] could produce on its own under average rainfall conditions," as the Commission erroneously concluded in its order. Thus, while Nantahala's contractual arrangements with TVA and Tapoco may benefit Nantahala with a guarantee that its minimal production capacity will be sustained during adverse conditions, these same arrangements appear to result in the anomalous situation that in periods of favorable stream flow and rainfall in which Nantahala's facilities produce more energy than its customers require, these customers must nevertheless pay extra for extra energy purchased by Nantahala from TVA. Any usable excess generated by Nantahala in such a year appears to accrue not to the benefit of its customers, but rather to that of its parent Alcoa, which "purchases" the remainder of the New Fontana entitlements *590 from Tapoco. Suffice it to say that the assertion that Nantahala's public is fairly served by a contract requiring Nantahala to purchase additional power regardless of the adequacy of its own generation assaults the common sense of this Court. Nantahala's customers should not be denied the benefit of their utility's fairly regular harvests of abundant energy.
Nantahala strenuously maintains that any investigation by the Commission into Tapoco's operations would be a useless gesture, since Tapoco has no power available under the New Fontana Agreement which is suitable for use by a public utility such as Nantahala. This argument is premised on the assumption that a public utility may count on only its primary energy as being continuously available to meet the requirements of its customers. Of the 205.1 mw of average power made available to Tapoco and Nantahala by TVA pursuant to the New Fontana Agreement, only 41.1 mw is primary energy, and that entire amount is allocated to Nantahala by the 1971 apportionment agreement. The remaining 164 mw of the New Fontana entitlement is delivered to Tapoco as "secondary" (interruptible) energy, unsuitable by definition for the continuous service demands of a public utility. Thus, the argument goes, Tapoco has "nothing left to give" to Nantahala, and a consideration of Nantahala and Tapoco as one integrated utility would simply fly in the face of reality. The Commission appeared to accept this contention when it concluded in its order that "it does not appear that Nantahala could obtain a better arrangement [than the New Fontana and 1971 agreements] in purchasing additional power from other utilities, in obtaining power from Tapoco since Tapoco power is not suited for a public utility load, or in negotiating individually with TVA." This conclusion is not, however, supported by the record. In the first place, a "better arrangement" was clearly had by Nantahala under the 1963 apportionment agreement, which guaranteed to Nantahala the greater of its monthly primary energy capability or its actual energy generation, plus annual cash payments from Alcoa. More importantly, a close examination of the New Fontana and 1971 apportionment agreements reveals that it is by the very terms of these contracts that Tapoco "has" no primary energy. Tapoco's facilities do in fact produce an "adjusted" primary energy component of 86.1 mw.[7] This power flows directly to TVA pursuant to the New Fontana integration agreement. All the entitlements that Tapoco receives in return are blocks of secondary, interruptible energy. Thus it is by the artificial constraints of contractual agreement, not factual necessity, that Tapoco is deemed to have no primary power suitable for public utility distribution.
This Court has faced before an attempt by Nantahala to justify its relationships with its parent Alcoa on the basis of distinctions between primary and secondary energy. In Utilities Commission v. Mead Corp., supra, 238 N.C. 451, 78 S.E.2d 290, we upheld the superior court's reversal of a rate increase allowed Nantahala by the Commission. We agreed in that case with the judge below "that the question of whether the power distributed [at low rates] to Alcoa was secondary power, and that to Mead [at higher rates] primary, was to a large extent the mere application of different labels to that which is essentially the same." Id. at 465, 78 S.E.2d at 300. Admittedly the instant case presents a factual matrix far more complex, and a series of contractual arrangements far more sophisticated, than those evidenced in Mead. Nevertheless, we cannot help but be struck by the fact that here, as in Mead, the distinction between primary and secondary energy availability is offered to explain certain anomalies that arise in the course of *591 Nantahala's contractual relationship with Tapoco and Alcoa. Here as in Mead, special care must be taken to insure that the contractual restrictions placed on Nantahala represent an appropriate response to the demands and necessities of Nantahala's public customers and not merely the product of the draftsman's artful use of technical labels.
In light of the foregoing, we cannot agree with the Commission that the evidence is insufficient to warrant the treatment of Nantahala and Tapoco as a single system for rate making purposes. The "roll-in" device, or technique, for rate making computation seems especially appropriate in a case such as this where one physically integrated system, interconnected in such a way that all power available to the system can be used to enhance its overall reliability and supply its requirements as a whole, is presided over by two corporate entities. See, e, g., Central Kansas Power Co. v. State Corporation Commission, 221 Kan. 505, 561 P.2d 779 (1977). This is especially true when both corporate entities are wholly owned by a parent corporation which benefits from the power generated by the system. This device does nothing more than recognize that the two corporate entities ought, for rate making accounting purposes, be treated as the one electrical power producing and distribution system which, in fact, they are. If then unlawful preferences are indeed accorded to Alcoa to the detriment of Nantahala's customers because of the separate corporate structures and the inter-corporate apportionment agreements, this rate making device would seem to eliminate them. The Commission erred in giving only minimal consideration to the evidence suggesting the propriety of the roll-in device. The case is remanded with directions to the Commission to obtain and consider information and data showing what Nantahala's cost of service to its customers would be if this method of rate making were used and whether Nantahala's customers would benefit thereby.
We leave to the Commission's discretion, however, the method whereby it will have provided to it the additional information necessary for a roll-in computation. The Commission is of course free to direct the applicant Nantahala to furnish such information. G.S. 62-32(b); G.S. 62-37.[8] And under the facts of this case, it would appear that the Commission also has jurisdiction to order Nantahala's parent Alcoa to come forth with the needed information. G.S. 62-3(23)(c).[9] Alternatively, the Commission may seek on its own motion to inspect Alcoa's or Tapoco's books and records under authority of G.S. 62-51.[10] Finally, assuming without deciding the correctness of the Court of Appeals' holding that Tapoco is a public utility subject to the Commission's regulatory authority, we note that the Commission may elect to join Tapoco as a party and order it to produce information relevant to the roll-in inquiry, subject only to the right of Tapoco, should it desire, to appear and contest de novo the Commission's assertion of jurisdiction over it.
*592 The Commission's order of 14 June 1977 authorizing an increase in Nantahala's rates was vacated by the Court of Appeals. The effect of the Court of Appeals' decision was stayed, however, by this Court's issuance of a writ of supersedeas pending the outcome of this appeal. Although that writ is hereby dissolved, we believe that essential fairness to all the parties is best served by allowing the increased rates to remain in effect, conditioned upon Nantahala's guarantee that it will in the future refund to its customers any overcharges should the new rates ultimately be determined excessive. Accordingly, we reverse the Court of Appeals' setting aside of the order of 14 June 1977 and direct the Commission to obtain adequate assurances of Nantahala's willingness and continued ability to refund such overcharges as may ultimately result from imposition of the 1977 rate schedule.
This cause is remanded to the Court of Appeals for remand to the Utilities Commission for further proceedings consistent with this opinion.
AFFIRMED IN PART.
REVERSED IN PART AND REMANDED.
BROCK, J., did not participate in the consideration or decision of this case.
NOTES
[1] "Primary energy" is a planning term which refers to that quantum of energy generation which is virtually assured under even the most adverse generation conditions. In the case of a hydroelectric facility, the "primary energy capability" is the amount of energy which the facility is theoretically assured to produce during the "critical hydro period"the period of the lowest stream flow of record. The period of record used to determine Nantahala's primary capability was the 36-year span from 1924 through 1959. The lowest stream flow which occurred during that period took place from June 1930 through November 1931. This 18-month "critical hydro period" was then used as an indicator of the lowest flow which might reasonably be expected to occur during the life of the Nantahala development. It was estimated that the Nantahala system (excluding the plants not covered by the New Fontana Agreement) would produce an adjusted minimum of 41.1 mw, or 360 million kwh annually, under stream flow conditions similar to the critical period. Nantahala's "primary energy capability" of 360 million kwh is thus the theoretical minimum annual potential generation of the Nantahala network.
[2] G.S. 62-133(b) provides inter alia that in the determination of a utility's rates, the Commission shall: (1) ascertain the fair value of the utility's "used and useful" property, taking into account original cost, depreciation, replacement cost, and other factors; (2) estimate the utility's revenue under present and proposed rates; (3) ascertain the utility's reasonable operating expenses, including that accruing through actual depreciation; and (4) fix a reasonable rate of return based on the foregoing factors.
[3] G.S. 62-94 provides in pertinent part:

"(b) So far as necessary to the decision and where presented, the court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning and applicability of the terms of any Commission action. The court may affirm or reverse the decision of the Commission, declare the same null and void, or remand the case for further proceedings; or it may reverse or modify the decision if the substantial rights of the appellants have been prejudiced because the Commission's findings, inferences, conclusions or decisions are:
(1) In violation of constitutional provisions, or
(2) In excess of statutory authority or jurisdiction of the Commission, or
(3) Made upon unlawful proceedings, or
(4) Affected by other errors of law, or
(5) Unsupported by competent, material and substantial evidence in view of the entire record as submitted, or
(6) Arbitrary or capricious." (Emphasis supplied.)
[4] Testifying on behalf of Nantahala, witness George Popovich, Power Management Consultant for Alcoa, stated several times that the formula by which Alcoa calculates its payments to Tapoco is totally unrelated to the true value of the Tapoco energy actually received by Alcoa:

"The amount which Alcoa pays to Tapoco pursuant to that formula is absolutely not a meaningful measure of the value of electricity which it sells to Alcoa. . . . The amount paid by Alcoa, the parent, to Tapoco, the wholly owned subsidiary, is money in one pocket and out the other, so to speak . . . . It would perhaps be more appropriate to describe the transactions between Tapoco and Alcoa in terms of an intra corporate transfer rather than in terms of purchase and sale." (R. p. 169).
". . . [I]n the case of Tapoco I think the [formula] understates the value rather than overstates it. I think it is unrealistically low. I think it's simply an interdepartmental transaction." (R. p. 299).
[5] It is true that comparison of 1975 total system load requirements with 1975 total generation provides little meaningful indication of how often Nantahala's output was in fact in excess of its requirements. However, a comparison of the 1975 generation and requirement figures on a month by month basis reveals that in February, March, April, May, June, and November of 1975, Nantahala's actual generation was considerably in excess of its public load demand. In March, 1975, for example, the Nantahala system generated over 67 million kwh. Its load requirement that month was slightly over 41 million kwh. Nevertheless, by virtue of the 1971 apportionment agreements, Nantahala's entitlement from TVA was limited to 30 million kwh per month. Nantahala thus would have had to purchase an additional 11 million kwh from TVA to meet its load requirements for March, despite the fact that its actual generation in March resulted in an excess of some 26 million kwh. At least some of the usable part of this excess presumably became part of Tapoco's New Fontana entitlement, to be transferred at low rates to Alcoa.
[6] See footnote 1 supra.
[7] Nantahala's witness George Popovich, see footnote 4 supra, testified to a study showing that Tapoco's primary energy contribution to TVA through the New Fontana Agreement is an average of 105.0 mw. When this figure is modified "in order to facilitate a comparison" with the New Fontana entitlements, Tapoco's contribution is shown as an average of 86.1 mw of "adjusted" primary energy.
[8] G.S. 62-32(b) gives the Commission "all power necessary" to compel a public utility to provide reasonable service. G.S. 62-37 authorizes the Commission to investigate and examine the management of any public utility "whenever it may be necessary in the performance of its duties."
[9] G.S. 62-3(23)(c) specifies that in rate making cases, the definition of "public utility" shall include a parent corporation of a public utility doing business in the state to the extent that the Commission shall find that the affiliation with the parent "has an effect" on the rates and services of the North Carolina utility. It is obvious from the record that the New Fontana and 1971 apportionment agreements, which arose in the context of Nantahala's affiliation with its parent Alcoa, have a direct bearing upon Nantahala's rates and services.
[10] G.S. 62-51 empowers the Commission and its staff to inspect books and records of corporations "affiliated with" regulated public utilities, "including parent corporations and subsidiaries of parent corporations." (Emphasis supplied.) The right to inspect extends to books and records located both within and without the state. In the case of a refusal by any such affiliated corporation to permit such an inspection, the Commission may order the regulated utility to show cause why it should not itself secure the documents to be inspected from its affiliate.