STATE OF NORTH CAROLINA ex rel Utilities Commission, Lee Telephone Company (Applicant), and Commission Staff (Intervenor), Appellees v. ROBERT MORGAN, Attorney General of North Carolina (Intervenor in behalf of the Using and Consuming Public of North Carolina), and Walkertown Telephone Exchange Committee (Protestant), Appellants

No. 91

(Filed 10 March 1971)

Telephone and Telegraph Companies § 1; Utilities Commission § 6— rate determination — rate base — plant under construction — interest charged to construction

In determining the rates for a telephone company, it was error of law for the Utilities Commission (1) to include in the rate base the value of the company's plant that was under construction at the end of the test period but not yet in operation and (2) to add to the

company's operating revenue for the test period the interest that was charged to construction during the test period.

ON rehearing, allowed for the sole purpose of extending the discussion of the propriety of the inclusion in the applicant's rate base of its property under construction at the end of the test period used by the Utilities Commission in fixing rates to be charged for telephone service, which discussion appears at page 273 in the opinion of this Court, filed 18 November 1970, and reported in 277 N.C. 255, 177 S.E. 2d 405.

*Attorney General Morgan, Deputy Attorney General Benoy and Maurice W. Horne, Special Assistant, for appellant.*

*Edward B. Hipp for Appellee North Carolina Utilities Commission.*

*Burns, Long & Wood, by Richard G. Long; Ross, Hardies, O'Keefe, Babcock, McDugald & Parsons by Melvin A. Hardies and Donald W. Glaves; and Duane T. Swanson for Appellee Lee Telephone Company.*

LAKE, Justice.

In our opinion heretofore filed in this matter, 277 N.C. 255, 177 S.E. 2d 405, we held that it was error for the Commission to include in the rate base of a public utility the value of plant under construction at the end of the test period and that it was also error for the Commission to add to the company's operating revenue for the test period interest charged to construction during the test period, these being approximately offsetting errors in the process of fixing rates to be charged for service in the future.

The basic, underlying theory of using the company's operating experience in a test period, recently ended, in fixing rates to be charged by it for its service in the near future is this: Rates for service, in effect throughout the test period, will, in the near future, produce the same rate of return on the company's property, used in rendering such service, as was produced by them on such property in the test period, adjusted for known changes in conditions.

During such test period, the previously established rates for the company's service produced X dollars in gross revenue.

Utilities Comm. v. Morgan, Attorney General

During the test period, which is usually twelve months, certain changes in conditions have taken place, such as, for example, an increase in the number of telephones in operation or other increase in the volume of revenue. *Pro forma* adjustments to revenue are, therefore, made to reflect what the revenues would have been in the test period had these present conditions prevailed throughout that period. When these adjustments are made, the result shows what revenues will be produced in twelve months by application of the previously established rates for service to conditions existing at the end of the test period; *i.e.*, at the date, nearest the present, for which data are available.

Similarly, when operating revenue deductions (operating expenses, depreciation, taxes and all other proper deductions from revenue) for expenditures actually made in the test period are likewise adjusted, *pro forma*, for changes in conditions during the test period, such as an increase in the wage rate, the result reflects what would have been the total of such deductions had the conditions, prevailing at the end of the test period, prevailed throughout it. When this is done, revenue deductions to be anticipated in a period of twelve months have also been computed on the basis of conditions prevailing at the most recent date for which data are available.

The next step is to substract the revenue deductions, so computed, from the revenues so computed, the difference being the company's net operating income. This having been done, it has been determined what net operating income this company may anticipate under the previously established rates, in a period of twelve months, during which all presently known conditions prevail. Such net operating income, divided by the rate base, gives the rate of return which the company may anticipate, on its properties used in rendering its service, under the previously established rates for service, in a period of twelve months, throughout which all presently known conditions prevail.

Obviously, conditions do not remain static. As the company enlarges its plant, and thereby serves more telephones, or otherwise increases its volume of service, its revenues, under the previously established rates, will increase. Its operating expenses, allowance for depreciation, taxes and other revenue deductions will also increase and its rate base will increase. If, however, the only change in condition is an enlargement of plant to increase the number of units of service, the previously estab-

lished rates, when applied also to those new units, will produce, in a period of twelve months, the same revenue, per unit, from the new units as was produced from the old units during the test period, adjusted *pro forma*. Likewise, the additional revenue deductions, on account of the new units, will be approximately the same, per unit, as those applicable to the old units, adjusted *pro forma*. Similarly, the rate base, per unit, of service will remain approximately the same as in the test period, adjusted *pro forma*, and so the rate of return will not be changed appreciably.

Consequently, if the rate of return derived from the previously established rates during the test period, adjusted *pro forma*, was less than a fair rate of return, the statute, G.S. 62-133(b), requires the Commission to raise the company's rates for service, assuming for present purposes that the quality of service is adequate. Conversely, if the rate of return derived from the previously established rates for service during the test period, adjusted *pro forma*, was in excess of a fair rate of return, the statute requires the Commission to reduce the rates for service. If the rate of return derived from the previously established rates for service during the test period, adjusted *pro forma*, was fair, no change in the rates for service is justified. In this State the test of a fair rate of return is that laid down by the Supreme Court of the United States in the Bluefield Water Company case, 262 U.S. 679, 43 S.Ct. 675, 67 L. Ed 1176; that is, if the company continues to earn such a rate of return, will it be able to attract on reasonable terms the capital it needs for the expansion of its service to the public? See, G.S. 62-133(b)(4).

In recent years the process of inflation has pushed upward the cost of plant additions. As a result, it is a fair generalization to say that units of service, such as telephones, added to plant, now require a greater investment in plant, per unit, than did the older units previously put in service. In consequence, continued application of the established rates for service, assuming no other change of condition, results in a gradual erosion of the rate of return from the plant as a whole. An accepted method of taking this circumstance into account in rate making is to fix rates for service sufficient, presently, to bring to the company a rate of return, on its present rate base, slightly in excess of that which is necessary to meet the foregoing test of

reasonableness. As new plant additions gradually erode this rate of return, it will sink to the reasonable level and then to a point slightly below reasonable. By thus averaging the rate of return at the reasonable figure over a period of years, the Commission can set rates for service at a level which will not require readjustment too frequently.

Assuming that the foregoing process has been followed with reasonable accuracy, the rates for service, so established, will, as a general proposition, produce, from investments by the company in additions to its plant, the same rate of return so found by the Commission to be fair. This is so because the new addition will put into service new units producing revenue and necessitating expenses, just as the old units produced revenue and necessitated expenses. Of course, this is not precisely correct with reference to every single addition to plant. For example, the construction of an office building does not, directly, add to revenues. Similarly, a large addition to central office equipment of a telephone company, or the extension of a power company's transmission line into a new territory, prior to the tapping on of a distribution system, will not immediately produce an addition to revenues, at least not an addition commensurate with the addition to the rate base. On the other hand, a subsequent investment in the distribution system, which the transmission line is designed to serve, or the installation of telephones, which the central office equipment is designed to serve, will result in an addition to revenues far in excess of an addition commensurate with the investment in such distribution system or telephones, considered alone. It is impossible to fix rates which will give the utility each day a fair return, and no more, upon its plant in service on that day. The best that can be done, both from the standpoint of the company and from the standpoint of the persons served, is to fix rates on the basis of a substantial period of time. Otherwise, rate hearings and adjustments would be a perpetual process.

Obviously, plant under construction at the end of the test period contributed nothing whatever to the revenues produced during that test period. To add the value of such plant, still under construction, to the rate base, without a *pro forma* adjustment to operating revenues and operating revenue deductions, would, necessarily, depress the rate of return, computed on the basis of the company's actual experience in the test period and

on the basis of the fair value of the properties which produced that return. This would clearly be unfair to the rate payers of the future, for whom the Commission is being requested to fix rates. It would be unfair because the rates for service would be fixed as if this addition to plant, when completed and put into service, were not going to produce any revenues, whereas in fact, under the previously established rates for service, this addition to plant, like the previously constructed plant, will produce revenue sufficient to yield a rate of return comparable to that earned by the old plant in the test period.

There is no unfairness to the utility company in excluding plant under construction from the rate base. Of course, when this addition to plant begins to serve the public, the utility is entitled then to begin to earn a fair return on that portion of its total investment, just as it does on the remainder of the plant. It is not entitled to earn a return on its investment in the plant addition before the plant addition is completed and begins to serve the public. This does not mean, however, that the utility forever loses the interest (or other cost of capital) which it pays (or incurs) during the construction of this addition to plant.

Of course while the addition is under construction, and so producing no revenue, because it renders no service, the company, either having borrowed money with which to build the addition or having put its own equity capital into this construction, incurs a cost of capital, which for convenience we shall call interest. Superficially, it appears that if this investment in plant under construction is not added to the rate base, the company is being deprived of a return, during construction, on its capital invested in the construction of the plant addition. Not so. The interest on the investment in this addition to plant, during the construction, is a part of its cost, just as truly as is the purchase price of the bricks, steel, copper wire, labor, etc., which go into the construction. Thus, when the addition to plant is completed and put into service the entire cost of it, including this interest, is added to the rate base of the company. The fair value, at that time, of the new addition would almost certainly be found to be its total cost and, thereafter, would be found by considering such cost and the reproduction, or trended, cost, including interest during construction. The interest during construction is recovered by the company, in full, through annual

charges to depreciation, just as the rest of the cost of the construction of the addition is recovered. In the future, the company earns a fair rate of return on that part of the construction cost, just as it does on the remainder.

On the other hand, to add to the rate base, which produced the test period revenues, the cost (fair value) of the addition to plant before the addition begins to render any service, without making any offsetting adjustment to net revenues on account of the customers to be served by this plant addition, would be unfair to the company's customers. It is so because to do this would result in a setting of rates for future service on the assumption that the addition to plant will never produce any revenue. If the plant under construction is to be added to the rate base, which produced the test period revenues, then there must, in fairness to the customers, be added to the test period net revenues an amount equal to the net revenue to be produced, under the previously established rates for service, from the telephones (or other units for service) resulting from the addition to the company's plant. Such a *pro forma* adjustment of net revenues would require *pro forma* adjustments of gross revenues and of all revenue deductions. Such *pro forma* adjustments can probably not be calculated with a reasonable degree of accuracy, certainly not without exceedingly complex calculations. If they could be calculated accurately, the end result would be to leave the company and its customers in substantially the same position as they would occupy had there been no addition to the rate base because of plant under construction and no offsetting adjustments to net revenue. There is no purpose to be served by such a procedure.

As we said in our previous opinion in this case, the addition of plant under construction to the rate base, together with the addition to test period revenues of "interest charged to construction," would not justify a remand of the matter to the Commission, the present record not being sufficient to show whether the company, the customers, or neither of them, suffered injury by these two approximately offsetting adjustments. However, these adjustments are, in our opinion, errors of law for the following reasons:

G.S. 62-133 prescribes the formula which the Commission is required to follow in fixing rates for service to be charged by a public utility. In paragraph (b) this statute states:

"(b) In fixing such rates, the Commisison shall:

"(1) Ascertain the fair value of the public utility's property *used and useful in providing the service* rendered to the public within this State * * * ." (Emphasis added)

The fair value of that property is the rate base. Paragraph (c) of this statute provides:

"(c) The public utility's *property* and its fair value *shall be determined as of the end of the test period* used in the hearing and the probable future revenues and expenses shall be based on the plant and equipment *in operation at that time.*" (Emphasis added)

The clear meaning of paragraph (c) is that the company's property which is "used and useful in providing the service rendered to the public" is to be determined "as of the end of the test period." A then half-completed generating plant of a power company, or a then half-completed line of telephone wire, cannot be deemed property "used in providing the service" "as of the end of the test period used in the hearing." Neither can it be deemed property "useful" in rendering the service at that time. This is not to say that such half-completed addition to plant has not economic value. Of course, it has economic value, but it is not property of the type which the Legislature has specifically stated is the only type of property to be included in the rate base.

Paragraph (c) of the above statute clearly provides that the Commission is to include in "the probable future revenues" of the company only those revenues "based on the plant and equipment *in operation* at that time" (emphasis added) ; *i.e.,* at the end of the test period. Thus, this provision of the statute makes it error for the Commission to make a *pro forma* adjustment to revenues, by adding to the actual revenue earned in the test period the item called "interest charged to construction," since, by hypothesis, the plant under construction is not "in operation" at the end of the test period.

The exclusion from the rate making process of both plant under construction at the end of the test period and "interest charged to construction" works no injustice upon either the company or its customers. To include in the rate making process

either of these items, without the other, would be an unjust distortion of the test period data for purposes of fixing future rates. The statute authorizes neither of these items to be included in the rate making process. Until it is changed by the Legislature, both the Commission and this Court must follow the statute as presently written.

Our former opinion in this matter is, therefore,

Reaffirmed.