STATE OF NORTH CAROLINA, EX REL. UTILITIES COMMISSION AND GLEN-
DALE WATER, INC. v. THE PUBLIC STAFF, NORTH CAROLINA UTILI-
TIES COMMISSION AND LACY H. THORNBURG, ATTORNEY GENERAL

No. 536A85

(Filed 3 June 1986)

1. **Utilities Commission §§ 31, 57— water company—findings sufficient for appellate review**

    The Utilities Commission's findings in a water utility case were sufficient to allow appellate review where the Commission failed to find that the interim rate of return of 14.56% was just and reasonable but found that that rate as the utility's permanent rate was appropriate; it was apparent that this rate was viewed as only appropriate because the Commission would have authorized a 15.42% rate of return had the utility's service been adequate; that determination was supported by competent and material evidence; there was evidence that the utility would continue to survive on the interim rate and would make a small profit on the 15.42% rate of return; the revenue increase granted was necessary not only to keep the utility financially afloat, but also to implement ordered improvements; the determination to penalize the utility was entirely proper; and the reasoning for finding the interim rate only appropriate was clearly and specifically set out in the order. N.C.G.S. § 62-94, N.C.G.S. § 62-79(a), N.C.G.S. § 62-131.

2. **Utilities Commission § 38— water company—operating expenses—legal fees for contesting fine—inclusion improper**

    The Utilities Commission in a water utility case improperly included legal fees in the utility's operating expenses where the fees were incurred contesting a penalty assessed for failure to notify the Division of Health Services and affected customers of maximum microbiological contaminant level violations. These legal fees were not incurred as an expense associated with providing water, but were the result of failure to provide adequate service. N.C.G.S. 62-94(b)(4).

3. **Utilities Commission § 27— water company—annual operating revenues and expenses—partial use of post-test year data—no error**

    The Utilities Commission did not improperly apply N.C.G.S. § 62-133(c) in calculating a water utility's annual operating revenues and expenses by refusing to adjust its figure for revenue based on evidence of post-test year growth although it increased the utility's operating expenses based on post-test year salaries. The Commission's order reflects its consideration of all pertinent data and the increase in operating expenses for salaries did not require any offsetting change in revenue because there was no correlation between the use of post-test year salary expenses and the utility's increase in customers.

4. **Utilities Commission § 19— water company—approval of transfer of stock—no error**

    The Utilities Commission's approval of the transfer of 52% of the stock in a water utility to the son-in-law of the present owner was supported by the

State ex rel. Utilities Comm. v. The Public Staff

evidence where the son-in-law had been elected president and general manager of the utility; he was a licensed C and B class well operator and a licensed electrician with a number of years experience in operating water systems and related businesses; he had been the utility's only licensed operator from April to October 1984; the son-in-law had indicated to the Commission his decision to improve the company's service and his willingness to invest his own time, energy, and money in the company, including assumption of corporate debts; the father-in-law was not currently involved in the management of the company; the son-in-law testified that he would not allow his personal relationship with his father-in-law to interfere with the proper management of the company; and, in light of the woefully inadequate service under the father-in-law, it could not be said that the Commission's determination that the company had a better chance of making improvements under the son-in-law was arbitrary and capricious.

5. **Utilities Commission § 35— water company truck—two-thirds of costs excluded from rate base—supported by evidence**

The Utilities Commission's conclusion that two-thirds of a water utility's investment in a 3/4-ton truck should be excluded from the rate base was supported by evidence that the utility did not perform major repairs to its water systems which required the use of the heavier truck but contracted those repairs to a nonregulated, affiliated company, and the president and general manager of the company testified that two lighter trucks were in use and were adequate.

6. **Utilities Commission § 38— water company—cost of unsuccessful expansion attempt excluded—no error**

The Utilities Commission's decision to exclude from a water utility's cost of service expenditures related to its unsuccessful attempt to expand its service area was supported by substantial evidence and was neither arbitrary nor capricious.

Justice MARTIN dissenting in part and concurring in part.

APPEAL by intervenors, Lacy H. Thornburg, Attorney General, and the Public Staff, North Carolina Utilities Commission, pursuant to N.C.G.S. § 7A-29(b) from the final order of the Utilities Commission entered 12 April 1985 in Docket No. W-691, Sub. 25. Intervenor-appellants' motion to bypass the Court of Appeals with respect to Docket No. W-691, Subs. 26 and 27 was allowed on 16 August 1985. The applicant, Glendale Water, Inc., has cross-appealed.

Glendale Water, Inc. (hereinafter Glendale) is a duly franchised public utility which provides water service to twenty-one[1]

---

1. This figure includes the Woodbrook subdivision which was included in Glendale's service area first by a temporary order issued on 18 October 1984 and later by the Commission's 12 April 1985 final order.

subdivisions in Wake County. On 6 August 1984, it filed an application with the North Carolina Utilities Commission seeking authority to increase its rates in all service areas. (W-691, Sub. 25). Glendale also filed a verified motion for emergency relief requesting that the proposed rates be put into effect immediately as interim rates subject to refund if not approved by the Commission. On 16 August 1984, Glendale applied for a Certificate of Public Convenience and Necessity to furnish water utility service in Woodbrook Subdivision in Wake County and for approval of rates. (W-691, Sub. 26). Glendale later filed an application on 26 November 1984 for permission to sell and transfer 52% of its stock owned by John G. Blankenship to E. Ray Vernon, Jr. (W-691, Sub. 27).

The Commission issued an order finding that Glendale's application in W-691, Sub. 25, constituted a general rate case, that the proposed new rates be suspended pending investigation, that the matter be scheduled for public hearing, that Glendale's suggested interim rates be approved, and that Glendale be restricted from applying for any new franchises until further notice. The Commission consolidated the three dockets for hearing and decision and the matter was heard by a Commission panel on 4-5 December 1984 and 14-16 January 1985. The Attorney General and the Public Staff intervened.

At the consolidated hearings, approximately forty-three Glendale customers representing nine of the subdivisions served testified as public witnesses. These witnesses, expressing opposition to the proposed rate increase, described their past and present problems with water quality and service, including water outages, water discoloration, fixture staining, pressure problems, strong chlorine odor, no chlorine in the water, poorly maintained electrical wiring, inconsistent billing practices, inaccurate billing, slow response to customer complaints, and late "boil notices" to warn of contaminated water.

In addition, Don Williams, an Environmental Protection Technician with the North Carolina Division of Health Services (DHS), and Andy Lee, a Utilities Engineer with the Public Staff's Water Division, testified concerning Glendale's extensive service and water quality problems. Mr. Williams stated that DHS had issued "boil notices" to customers in six of Glendale's service subdivi-

sions due to the detection of bacteria contamination. Williams indicated that had Glendale chlorinated the water as required by DHS regulations, the contamination could most likely have been avoided. Public Staff Engineer Lee testified that Glendale either had no chlorination equipment or inoperative chlorination equipment in fifteen of the subdivisions it served. Lee further stated that during the test year, a twelve-month period ending on 31 December 1983, Glendale had been assessed a $13,000 penalty by DHS for failing to notify the agency and the affected customers of maximum microbiological contaminant violations. After the test year, but prior to the hearings, Glendale was given two additional administrative penalties.

The testimony offered by the public witnesses, Mr. Williams and Mr. Lee, was not contested by Glendale. E. Ray Vernon, current Glendale president seeking to purchase 52% of the company's stock from John Blankenship, testified that he was aware of the existing water quality and service problems. However, he outlined the corrective measures he would implement if the Commission approved the stock transfer.

With regard to the rate increase, Glendale and the Public Staff presented evidence to support their respective contentions as to what increase, if any, the Commission should grant Glendale. By its application, Glendale requested an increase in its annual revenues of $52,511. In granting Glendale's petition for emergency relief, the Commission had authorized an interim rate increase in annual revenues of $34,883, a 14.56% rate of return. The Public Staff recommended that due to Glendale's grossly inadequate service no increase in revenues was justified.

The Commission, in its 12 April 1985 order, found and concluded that if Glendale's service had been adequate, it would have been entitled to an increase of $36,208 on the basis that a 15.42% rate of return on operating expenses would be fair and reasonable to both the company and its customers. However, in light of Glendale's inadequate service, the Commission concluded that the interim rate of return, previously imposed, constituted the appropriate increase to which Glendale was entitled. In effect, Glendale was penalized by the Commission $1,325 in annual revenues for its poor water service.

State ex rel. Utilities Comm. v. The Public Staff

*Johnson, Gamble, Hearn & Vinegar, by M. Blen Gee, Jr., attorneys for plaintiff-appellee Glendale Water, Inc.*

*Public Staff, Robert P. Gruber, Executive Director, by Paul L. Lassiter and Lorinzo L. Joyner, Staff Attorneys for defendant-appellant Public Staff.*

*Lacy H. Thornburg, Attorney General, by Angeline M. Maletto, Associate Attorney, for defendant-appellant Lacy H. Thornburg, Attorney General.*

BRANCH, Chief Justice.

The first assignment of error presented by the Attorney General and the Public Staff states that the Commission erred in granting Glendale a $34,883 annual increase in revenues when it found as a fact that Glendale has failed to provide adequate water service. The Commission's order contains these findings in pertinent part:

6. Under present rates, the Applicant's annualized level of operating revenue is $111,348. Under the Applicant's proposed rates, the annualized level of operating revenue would be $163,859. Under the Commission's approved rates, the annualized level of operating revenue is $146,231.

. . . .

8. The reasonable level of test year operating revenue deductions for the Company after accounting, pro forma, and end-of-period adjustments is $123,192.

9. The operating ratio methodology is appropriate for fixing rates in this proceeding as the Company's level of original cost rate base is lower than its level of operating revenue deductions under present rates.

10. Under present rates after accounting, pro forma, and end-of-period adjustments, the Applicant will experience a negative 9.97% rate of return on operating expenses requiring a return.

11. Under the approved rates, after accounting, pro forma, and end-of-period adjustments, the Applicant will experience a 14.56% rate of return on operating expenses

requiring a return. The interim rates which became effective on September 10, 1984, are appropriate and hereby approved.

The order also contains these findings concerning Glendale's inadequate water quality and service:

14. The Applicant has been required to issue "Boil Notices" for some of its systems due to bacteria contamination.

15. The Applicant has not provided adequate water utility service to its customers as it has failed to maintain continuous disinfection (chlorination) of drinking water on its community water systems to safeguard public health as required by G.S. 130A-311.

16. The Applicant has been assessed three administrative penalties within the past 15 months by the North Carolina Department of Human Resources Division of Health Services for violation of rules and regulations concerning the operation of its community water systems.

17. The Applicant has not provided adequate water utility service to customers residing in A Country Place. These customers have experienced continual problems of discolored water, sediments in the water, low water pressure, staining of plumbing fixtures and appliances, water outages, improper chlorination of the water, unsafe exposed electrical wiring at the well house, and billing irregularities.

18. The Applicant has not provided adequate water utility service to customers residing in Glendale, Burnside, Chari Heights, Belmont, and Rollingwood subdivisions. These customers have experienced continual problems of discolored water, sediment in the water, low water pressure, staining of plumbing fixtures and appliances, improper chlorination of the water, bacteria contamination of the water, and billing irregularities.

19. The Applicant has failed to provide adequate water utility service in Woodscreek Subdivision. Woodscreek residents have experienced prolonged outages, low pressure problems, residue and staining problems, and contaminated water.

20. The Applicant has failed to provided adequate water utility service to the customers residing in Lynnhaven, Crowsdale, Englewood, Orchard Knolls, and Surry Point subdivisions. These customers have experienced continual problems of discolored water, low pressure, air in lines, staining of plumbing fixtures, and billing irregularities.

21. The Applicant has failed to accurately read its customers' meters and render correct bills on a consistent basis.

22. The Applicant has failed to maintain good customer relations with its customers.

23. There is a need for the Applicant to make substantial improvements in its accounting procedures, including the setting up of an on-site set of accounting records.

In a later section of the order, entitled "Evidence and Conclusions for Findings of Fact 9, 10, 11," the Commission provides as follows:

The evidence supporting this finding of fact is included in the affidavit of Public Staff witness Bowerman and the testimony of Company witness Vernon. Witness Bowerman states that because the Company's rate base is small in relation to its operating expenses, the operating ratio method provides a more reasonable level of revenue.

In the absence of any evidence to the contrary and based upon the Commission's determination of original cost rate base and operating revenue deductions, as hereinafter shown, the Commission concludes that the operating ratio method is the proper procedure to be used for the determination of the revenue requirement in the proceeding.

Witness Bowerman recommended that Glendale should be granted a 15.42% margin on expenses which relates to an operating ratio of 91.70% (including taxes and interest) or 86.64% (excluding taxes and interest). However, the Public Staff recommends that the Company not be given any revenue increase at this time due to inadequacy of service and deficiency in accounting procedures. The Company agreed that the 15.42% margin in operating revenue deductions recommended by the Public Staff would generate an adequate rate of return.

[The Commission concludes that a 15.42% rate of return on operating expenses requiring a return would be fair and reasonable to both the Company and its customers.

(Based upon a 15.42% rate of return, the Commission finds that an annual revenue increase of $36,208 over present rates is appropriate.

However, the Company's interim rates currently in effect will yield an annual revenue increase of $34,883 over present rates and according to witness Vernon the Company will survive if it is granted the interim rates now in effect. Therefore in consideration of the Company's inadequate service, the Commission concludes that the interim rates, which became effective on September 10, 1984, are appropriate for use in this proceeding.)

These rates produce a 14.56% rate of return on operating expenses requiring a return.]

The Commission then includes two schedules summarizing the gross revenues and the rate of return the Company should be able to achieve based on other determinations and calculations within the order.

The Attorney General and the Public Staff contest the Commission's order granting Glendale a rate increase on three grounds. First, they contend that the Commission's finding that had Glendale's water service been adequate a $36,208 annual increase in revenues would have been appropriate is not supported by competent, material, and substantial evidence. Secondly, they argue that the Commission's imposition of the interim rate as a penalty for Glendale's inadequate service is arbitrary and capricious. They assert that in light of the Commission's extensive findings, reflecting the overwhelming and uncontradicted evidence of Glendale's inadequate service, the penalty of $1,325, the difference between $36,208, the increase that would have been granted, and $34,883, the increase under the interim rate, is insufficient. Thirdly, the Attorney General and the Public Staff contend that the Commission failed to make the necessary findings that the interim rate constituted a "just and reasonable" increase and that the $1,325 penalty was adequate under the circumstances. Essentially, these parties argue that the Commission

erred in granting the $34,883 increase and erred in failing to make specific findings that would allow a court to properly review its decision.

[1] The scope of our review of an order of the Utilities Commission is clearly provided in N.C.G.S. § 62-94. We are expressly authorized to affirm or reverse the decision of the Commission, or remand the case for further proceedings, if the Commission's findings or conclusions are, *inter alia*:

> (4) Affected by other errors of law, or
>
> (5) Unsupported by competent, material and substantial evidence in view of the entire record as submitted, or
>
> (6) Arbitrary or capricious.

N.C.G.S. § 62-94(b)(4), (5), (6) (1982). In accordance with this limited right of review, all findings of fact made by the Commission, which are supported by competent, material and substantial evidence, are conclusive. The authority to determine the adequacy of the utility's service and the rates to be charged lies with the Commission and a reviewing court may not modify or reverse its determination merely because the court would have reached a different finding based on the evidence. *Utilities Comm. v. Telephone Co.*, 281 N.C. 318, 189 S.E. 2d 705 (1972). In order to enable the court on appeal to determine the controverted questions presented in the proceedings, N.C.G.S. § 62-79(a) requires that all final orders of the Commission contain "[f]indings and conclusions and the reasons or bases therefor upon all material issues of fact. . . ." The failure to include all the necessary findings of fact is an error of law and a basis for remand upon N.C.G.S. § 62-94(b)(4) because it frustrates appellate review. *State ex rel. Utilities Comm. v. Conservation Council*, 66 N.C. App. 456, 311 S.E. 2d 617, *aff'd* in part and *rev'd* in part on other grounds, 312 N.C. 59, 320 S.E. 2d 679 (1984). *See also Utilities Commission v. Membership Corporation*, 260 N.C. 59, 131 S.E. 2d 865 (1963). We disagree with the Attorney General and the Public Staff that the Commission has failed to make sufficient findings of fact to allow us to adequately review its decision.

First, we acknowledge that the Commission technically failed to find that the interim rate of return of 14.56% was "just and reasonable" to the Company and its customers as required under

N.C.G.S. § 62-131. Finding of Fact No. 11 merely states that this rate as Glendale's permanent rate is "appropriate." Yet, it is apparent that this rate was viewed by the Commission as only "appropriate" because had Glendale's service been adequate the Commission would have authorized a 15.42% rate of return. This determination is supported by competent and material evidence. Public Staff witness Bowerman and Glendale agreed that, if an increase were granted, a 15.42% margin in operating revenue deductions would generate an adequate rate of return. The interim rate of 14.56%, an annual revenue increase of $34,883, had been previously approved in the Commission's interlocutory order establishing these proceedings as a general rate case due to the fact that Glendale had "shown that it is experiencing a degree of financial difficulty sufficient to justify interim rate relief." Similarly, in these proceedings to determine Glendale's permanent rate, there was evidence presented by Company witness Vernon that Glendale could continue to survive on the interim rate. Thus, if the Company had been granted the 15.42% rate of return, an annual revenue increase of $36,208, Glendale would have been allowed a small profit. Yet, because of its inadequate service record, the Commission refused to include in the rate increase any provision for a company profit, but merely granted Glendale an increase which would permit it to stay in business. Based on the evidence presented, the Commission's determination to penalize Glendale by deleting its profit from the rate increase was clearly proper.

Furthermore, in *Utilities Comm. v. Morgan, Attorney General*, 277 N.C. 255, 266, 177 S.E. 2d 405, 412-13 (1970), *reaffirmed*, 278 N.C. 235, 179 S.E. 2d 419 (1971), this Court stated that .it is not unlawful for the Commission, in the exercise of its discretion, to grant an increase in rates, notwithstanding existing service inadequacy, as an appropriate step in the improvement of the service. In the present case, the Commission ordered Glendale to make extensive and specific improvements in upgrading its existing water systems and in its business practices. The Commission's order requires:

4. That the Applicant shall set up and maintain an onsite set of accounting records, adequately document all cash receipts and disbursements, and take all other steps necessary to adequately control its cash inflows and outflows.

5. That the Applicant shall not acquire nor add on any additional water systems nor extend its mains outside the boundaries of its platted subdivision until upgrading of the existing systems is completed and upon certification to the Commission that all existing systems are constructed in accordance with plans approved by the Division of Health Services, and then only after further Order by the Commission.

6. That the Applicant, within 60 days after the effective date of this Order, shall file a report with this Commission as to the progress it is making toward completing the improvements needed to bring each of its water systems into complete compliance with all the Division of Health Services Rules and Regulations. Said report shall describe the improvements made since the effective date of this Order, the location of each improvement, the amount of expenditure for each improvement, the vendor to whom each expenditure was made, and the improvement remaining to be made before each system is brought into complete compliance with the Division of Health Services Rules and Regulations. Once said report is filed, the Applicant shall begin filing a similar report on a bimonthly basis.

Thus, the revenue increase was necessary not only to keep Glendale financially afloat due to its present difficulties, but also to implement these ordered improvements.

We, therefore, hold that the Commission's finding and conclusion granting Glendale a 14.52% rate of return (in effect continuing the interim rate) are supported by competent, material, and substantial evidence. Likewise, based on the intended improvements outlined by Glendale's new president and proposed owner, E. Ray Vernon, Jr., and those improvements ordered by the Commission, we fail to see how the Commission's order can be considered arbitrary and capricious. We further hold that the Commission committed no error of law by failing to expressly find the interim rate to be "just and reasonable."

In *Utilities Comm. v. Telephone Co.*, 285 N.C. 671, 208 S.E. 2d 681 (1974), this Court affirmed an order of the Commission denying the utility a rate increase on the basis of inadequate service. The Court of Appeals had ordered the case remanded to the

Commission for its failure to find facts with respect to the effect it gave the factor of inadequate service. This Court agreed that the Commission should have found these particular facts but held under the circumstances of the case that remand would serve no useful purpose. We reasoned that

> [t]he effect given by the Commission to inadequacy of service due to management is shown clearly and precisely. It is apparent from consideration of the order of the Commission, in its entirety, that the denial of the request for an increase in rates for service was due to the Commission's finding of gross inadequacies of service due to management and personnel deficiencies rather than to plant deficiencies.

*Id.* at 688, 208 S.E. 2d at 692. In the present case, such a determination by the Commission is just as apparent. Because its reasoning for finding the interim rate only "appropriate" is clearly and specifically set out in the order, appellate review which normally suffers due to the lack of proper findings was not frustrated in this case.

[2] By their second assignment of error, the Public Staff and the Attorney General contend that the Commission improperly included as operating expenses legal fees incurred by Glendale in contesting the amount of a penalty assessed against it for a violation of administrative regulations. This $13,000 penalty was imposed for Glendale's failure to notify the Division of Health Services of maximum microbiological contaminant level violations and for its failure to notify affected customers of these violations. Glendale did not contest the assessment of the penalty itself, but only disputed the reasonableness of the penalty amount. In calculating the reasonable level of Glendale's operating revenue deductions or expenses, the Company included $1,938 in legal fees spent in challenging the amount of the penalty. At the time of the public hearings, the penalty assessment dispute was still in litigation. The Public Staff argued to the Commission that if the dispute was resolved against the Company, it would not be properly included as an expense to be recovered from the ratepayers. Therefore, it would also be improper to require the ratepayers to pay for any of the cost prior to the determination of liability.

Under the heading, "Evidence and Conclusions For Finding of Fact No. 8," the Commission recited the following:

[The Commission concludes that the legal expense incurred by the Company in the good faith defense of the penalty assessment by the Division of Health Services is a reasonable and necessary expenditure of Glendale.

Every person is entitled to due process of law and to representation of counsel. If the Company feels that the penalty assessed was too high, it has a right to be heard, to present evidence, and to try to prove the unfairness of the penalty. There was no suggestion that the Company's challenge to the administrative penalty was being made by the Company in bad faith. The Commission concludes that the legal expense should be included; but because such expense is unusual and nonrecurring, the Commission is of the opinion that the expense should be amortized over a period of three years. Therefore, the Commission concludes that $646 ($1,938/3) should be included in expenses to reflect the amortization of the legal costs related to the penalty assessment by the Division of Health Services.]

Although this particular issue has not been considered, the question of whether other types of legal fees are includable as operating expenses has been previously addressed by the Commission. In 1980, the Commission concluded that it would be unreasonable and against public policy to require Southern Bell customers to pay for the company's legal expenses incurred in defending against a sex discrimination suit brought by a group of female employees. The Commission reasoned that since the Company's expenditures, including attorney's and witness's fees, were incurred only because Southern Bell had been found to have violated federal statutes, these expenses should be excluded from the cost of service. *In re Southern Bell Teleph. & Teleg. Co.*, Docket No. P-55, Sub. 777, Feb. 7, 1980. In 1981 and 1982, the Commission found that costs incurred by the Company in defending the Justice Department's antitrust suits were reasonable and proper costs associated with providing public utility service and could be recovered from the ratepayers. *In re Southern Bell Teleph. & Teleg.*, 46 PUR 4th 285 (N.C. 1982); *In re Southern Bell Teleph. & Teleg.*, 42 PUR 4th 18 (N.C. 1981).

A survey of decisions by utilities commissions from other jurisdictions reveals, as is apparent from the North Carolina deci-

sions, that whether legal expenses may be considered as operating expenses and legitimately recovered from the ratepayers depends on the type of legal dispute or service involved. For instance, legal fees incurred in connection with antitrust suits are generally allowed as operating expenses. (Calif.—*In re Pacific Teleph. & Teleg. Co.* Decision No. 83-12-025, Dec. 7, 1983; Ohio—*In re Cleveland Electric Illum. Co.*, 46 PUR 4th 63 (1982); Ala.—*In re South Central Bell Teleph. Co.* Docket Nos. 18075, 18076, Sept. 4, 1981; Wash.—*Washington Utilities & Transp. Comm. v. Pacific Northwest Bell Teleph. Co.*, 39 PUR 4th 126 (1980)). Legal expenses incurred in contesting tax assessments are most often denied as an operating expense. (Ill.—attorney's fees in payment for seeking a reduction of personal property tax excluded, *In re Prestwick Utilities Co.*, 58983 March 19, 1975; Pa.—moneys for legal proceedings concerning real estate taxes excluded, *Garber v. Philadelphia Suburban Water Co.*, 87 PUR 3d 250 (1971)). Legal fees incurred in discrimination suits against the utility are generally denied. (Pa.—*Penn. Pub. Utility Comm. v. Equitable Gas Co.*, 54 PUR 4th 406 (1983); Calif.—*In re Pacific Gas & Elec. Co.*, Decision 93887, Dec. 30, 1981).

It is also instructive to review decisions in which legal fees for civil actions alleging some fault on the part of the utility were sought to be included as operating expenses. In *In re Citizens Utilities Co. of California*, 58 PUR 3d 155 (1965), the California Utilities Commission ruled that legal expenses incurred by a water company primarily as a result of errors and omissions in the design and construction of a water reservoir would not be charged against the company's customers. The New Jersey Utilities Commission found legal expenses incurred by a water and sewer company in connection with a civil suit for alleged pollution of the Metedeconk River improper as operating expenses. *In re Lakewood Water Co.*, 13 PUR 3d 571 (1956). In Pennsylvania, a claim by a water company for the inclusion of costs incurred in defending a service complaint, where the utility was found to be at fault, was denied. *Township of Spring v. Citizens Utilities Water Co. of Pa.*, 65 PUR 3d 134 (1966).

It is evident that whether certain legal costs are considered to be operating expenses is determined by utilities commissions on a case-by-case basis and according to several general guidelines. Several commissions, including North Carolina, look to see

if the legal fees are a reasonable and necessary expense for the utility in providing its services. *Pa. Public Utility Comm. v. Duquesne Light Co.*, 51 PUR 4th 198 (Pa. 1983); *In re Cleveland Electric Illum. Co.*, 46 PUR 4th 63 (Ohio 1982); *In re Southern Bell Teleph. & Teleg.*, 46 PUR 4th 285 (N.C. 1982). Other utilities commissions measure the specific benefit the underlying legal proceeding will provide the ratepayers. *In re Columbia Gas of Kentucky, Inc.*, 55 PUR 4th 156 (Ky. 1983); *In re Chesapeake & Potomac Teleph. Co.*, 43 PUR 4th 169 (D.C. 1981); *In re Northwestern Bell Teleph. Co.*, 37 PUR 4th 1 (Minn. 1980); *Washington Utilities & Transportation Comm. v. Pacific Northwest Bell Teleph. Co.*, 26 PUR 4th 495 (Wash. 1978); *In re Citizens Water-Supply Co. of Newtown*, 3 PUR 4th 82 (N.Y. 1973). Furthermore, utilities commissions often determine whether litigation expenses may be included as operating expenses depending on whether they are incurred in good faith. *In re Pa. Pub. Utility Commission v. Freeport Water Co.*, 56 Pa. PUC 513 (Pa. 12/3/82); *In re Lake Spring Water Co.*, 70 Md. PSC 259, Case No. 7244 (Md. 8/29/79); *In re Fitchburg Gas & Electric Light Co.*, D.P.U. 19084 (Mass. 8/31/77). Finally, some commissions consider the actual outcome of the litigation and whether the legal expenses could have been avoided through prudent management. *In re Oklahoma Gas & Elec. Co.*, 58 PUR 4th 414 (Okla. 1984) (prudent management rewarded with inclusion of legal fees as operating expenses); *In re Boston Gas Co.*, 49 PUR 4th 1 (Mass. 1982) (outcome irrelevant); *In re Citizens Water-Supply Co. of Newtown*, Case 27557, Opinion No. 80-12 (N.Y. 3/31/80) (outcome irrelevant); *In re Texas Electric Service Co.*, Docket No. 2606 (Tex. 10/16/79) (disallowed since could have been avoided by prudent management); *Township of Spring v. Citizens Utilities Water Co. of Pa.*, 65 PUR 3d 134 (Pa. 1966) (outcome matters).

In the present case, our Commission found that Glendale's legal fees which were incurred in contesting the amount of the administrative penalty were recoverable as part of its operating expenses. The Commission found that the legal fees were "a reasonable and necessary expenditure" of Glendale which was associated with its water service to its customers. Based on the evidence presented, this conclusion is incorrect and constitutes an error of law under N.C.G.S. § 62-94(b)(4). In the first place, these legal fees were not incurred as an expense "associated" with

Glendale's task of providing water to its customers. Rather, these legal fees were incurred as a result of Glendale's failure to provide adequate water service. It is important to note that Glendale did not contest the imposition of the penalty itself, but only disagreed with the amount of the penalty assessed against it. Glendale was penalized for violating serious administrative regulations, including its failure to notify its customers of contaminants in the water. It would be improper to require the very class of people the DHS sought to protect in assessing the penalty against Glendale to indirectly pay for the penalty through the inclusion of related legal fees into Glendale's operating expenses. Furthermore, since these legal fees could have been avoided had Glendale initially carried out its responsibility of providing adequate water service to its subdivisions, this expense cannot properly be considered reasonable or necessary. We, therefore, hold that the Commission improperly included as part of Glendale's operating expenses the $1,938 in legal fees.

[3] The third assignment of error, raised by the Public Staff, concerns whether the Commission correctly applied N.C.G.S. § 62-133(c) in calculating Glendale's annual operating revenues and expenses. The Public Staff contends that the Commission's determination in this regard is erroneous for two reasons. First, the Commission used 1985 estimated data to determine a component of Glendale's expenses, but used the 1983 test year data to determine the Company's revenues. According to the Public Staff, this "mismatch" improperly distorts the ratio of expenses to revenue and the test year concept of N.C.G.S. § 62-133(c). Secondly, the Public Staff argues that once the Commission used the 1985 data in calculating expenses, it was required under N.C.G.S. § 62-133(c) to examine other post-test year changes in evidence to determine whether similar adjustments were appropriate to offset expenses by revenues.

N.C.G.S. § 62-133(c) provides in pertinent part:

> The original cost of the public utility's property . . . shall be determined as of the end of the test period used in the hearing and the probable future revenues and expenses shall be based on the plant and equipment in operation at that time. *The test period shall consist of 12 months' historical operating experience prior to the date the rates are pro-*

*posed to become effective, but the Commission shall consider such relevant, material and competent evidence as may be offered by any party* to the proceeding tending to show actual changes in costs, revenues or the cost of the public utility's property used and useful . . . which is based upon circumstances and events occurring up to the time the hearing is closed.

(Emphasis added.) N.C.G.S. § 62-133(d) further states that "[t]he Commission shall consider all other material facts of record that will enable it to determine what are reasonable and just rates."

The component of Glendale's expenses based on the 1985 estimated data in question was salaries. The Company proposed that its actual salary expenditure for the 1983 test year, $41,263, be adopted by the Commission. The Public Staff recommended that Glendale's current salaries be annualized for a total of $35,010 because the Company had fewer employees at the time of its 1984 audit. The Commission, on the other hand, concluded that the Company's 1985 estimated salary expenditure of $43,544 was the appropriate salary expense to be included. The Commission reasoned as follows:

### 1983 — Company's Actual Expenditures

| | |
|---|---|
| Salaries other than owner — bookkeeper/receptionist and meter reader/maintenance | $18,733 |
| Subcontract — Ray Vernon | 10,530 |
| Owner salary | 12,000 |
| Total | $41,263 |

. . . .

### 1985 — Company's Estimated Expenditures

| | |
|---|---|
| Salaries other than owner: | |
| Maintenance person | $11,044 |
| Bookkeeper/receptionist/ computer operator | 14,000 |
| Estimated overtime | 1,500 |
| Estimated subcontract ($5,000 to $7,000) | 5,000 |
| Owner salary | 12,000 |
| Total | 43,544 |

As the figures above indicate, Glendale will have similar salary expenses for 1985 to those actually incurred in 1983, even though Glendale will have fewer full-time employees. Especially important to note is the overtime expense estimated for 1985. By having an additional employee in 1983, Glendale avoided paying time and one-half for overtime. Glendale made a management decision concerning the number of employees it would have and how much they would be paid in 1983 which was different from the management decision Glendale made in 1985. However, there is nothing in the record to suggest that either management decision is unreasonable.

Based upon the evidence presented and in view of the extensive improvements that Glendale is herein ordered to make and the substantial amount of routine maintenance which will be necessary to keep the Glendale water systems operating properly, the Commission concludes that the Company's 1985 estimated salary expenditure of $43,544 is the appropriate level of salary expense to be included in this proceeding. The Commission finds that this salary level of $43,544 will enable the Company to adequately pay its personnel to properly maintain the system and correct the problems discussed herein. Furthermore, the Commission acknowledges that the salary level of the owner (Ray Vérnon), which is $12,000, has been agreed to by the parties, but the Commission considers it to be too low considering the size of the Glendale operations, the extensive maintenance required by the system and the testimony of witness Vernon that he works days, nights, and weekends and that in the most current week he had worked 105 hours for Glendale. Witness Vernon further testified that he works solely for Glendale Water, Inc., as "there are not enough hours in the day" to do any other independent contract work on the side. The Commission concludes that $43,544 is the appropriate salary level.
. . .

In a nutshell, the Public Staff contends that since the Commission used Glendale's 1985 estimated salary expenditures to calculate its expenses, it should have been required to adjust Glendale's revenues based on the Company's continuing customer growth. The Public Staff asserts that there was uncontradicted

evidence that Glendale's customer base in the 1983 test year increased 30.1%, from 449 to 584. In the twelve months following the test year, calendar year 1984, Glendale's customer base increased approximately another 22%, from 584 to 712. Moreover, Company witness Ray Vernon testified that at the time of the hearings, construction of new homes was in progress in fifteen subdivisions served by Glendale. The Public Staff argues that in light of the Commission's findings that Glendale had experienced post-test year growth, it improperly failed to adjust revenues to reflect the increase in annual operating revenues that Glendale would experience due to that growth.

We reject this argument. In the first place, the Public Staff admits in its brief that "the Commission's decision falls within the letter of the statutory requirements." The Commission is required under N.C.G.S. § 62-133(c) to determine probable future revenues and expenses and to consider such relevant, material and competent evidence as may be offered which tends to show actual changes in costs or revenues. The Commission's order reflects that it considered all pertinent data.

Secondly, these statutory tasks are required in order to help the Commission arrive at the reasonable rate the utility may charge for its services. This determination is solely for the Commission and must be upheld by this Court if based on adequate findings of fact supported by competent evidence. *Utilities Commission v. Duke Power Co.*, 305 N.C. 1, 287 N.C. 786 (1982). We find that the Commission did not improperly refuse to adjust its figure for revenues based on evidence of post-test year growth although it increased Glendale's operating expenses based on other post-test year evidence. Contrary to the Public Staff's contention, there is no correlation between the use of post-test year salary expenses and Glendale's increase in customers. The Commission in its order explains that the use of 1985 estimated salary expenditures was appropriate because it had ordered additional improvements and increased routine maintenance. Thus, the increased allowance in operating expenses for salaries did not require any offsetting change in revenue. The Public Staff's reliance therefore on *Utilities Commission v. Public Staff*, 52 N.C. App. 275, 278 S.E. 2d 599 (1981), is misplaced because in that case the expenses included and the revenues excluded were necessarily related.

We therefore hold that the Commission's conclusion that 1985 estimated expenditures were the appropriate allowance for salary expenses is supported by competent, material, and substantial evidence. Further, we hold that the Public Staff has failed to show that the Commission's refusal to increase revenues by post-year customer growth was arbitrary or capricious or contributed to the adoption of a rate which was unjust.

[4] The fourth assignment of error, raised by the Attorney General, involves the Commission's approval of the transfer of 52% of the Company's stock to E. Ray Vernon, Jr. The Attorney General contends that the Commission's finding that the transfer is in the best interest of the customers is not supported by any evidence and is arbitrary and capricious.

The Attorney General argues that the Commission failed to consider the evidence presented by several Glendale customers at the public hearing concerning their doubts as to Mr. Vernon's ability to manage a utility. These customers were also concerned with the transfer on the basis that Vernon was the son-in-law of the previous owner John Blankenship. They felt that Blankenship, who in their opinion had failed to provide adequate service, would still exert important influence upon the Company's operations due to this personal relationship.

As previously stated, the Commission's findings, if supported by competent, material, and substantial evidence in view of the record as a whole, are binding upon this Court. *Utilities Commission v. Telegraph Co.*, 267 N.C. 257, 148 S.E. 2d 100 (1966). The Commission's determination may not be reversed or modified by a reviewing court merely because that court might have reached a different determination upon the same evidence. *Utilities Comm. v. Telephone Co.*, 281 N.C. 318, 189 S.E. 2d 705 (1972).

We hold that the Commission's finding that the stock transfer was in the best interest of the customers is supported by competent, material, and substantial evidence. Vernon testified that as of November 1984 he was elected President and General Manager of Glendale and that he is a licensed C and B class well operator and licensed electrician with a number of years experience in operating water systems and related business. In fact, except for the months of April through October 1984, Vernon was Glendale's only licensed operator. Vernon further indicated to the

Commission his desire to improve the Company's service and his willingness to invest his own time, energy, and money in the Company, including the assumption of $53,000 of Glendale's corporate debts. There was also evidence presented that Mr. Blankenship was not currently involved in the management of the Company. Vernon testified that he would not allow his personal relationship with Blankenship to interfere with the proper management of the Company. Since there is substantial evidence to support the Commission's determination, it would be inappropriate for this Court to substitute its judgment for that of the Commission's.

Furthermore, in light of the overwhelming evidence presented concerning Glendale's woefully inadequate services under Blankenship's management, we cannot say that the Commission's determination that the Company had a better chance of making improvements under Vernon's control is arbitrary and capricious.

[5] In its cross-appeal, Glendale first assigns as error the Commission's exclusion of two-thirds of its investment in the 3/4-ton Ford truck for computing its rate base and depreciation, and related expenses. The Commission concluded that while there are times it is cost justified for Glendale to have this heavy truck available, it would be inappropriate to allow the entire amount in the rate base.

The evidence showed that Glendale owned three trucks, the Ford truck in question and two lighter vehicles. All parties agreed that two of the vehicles were appropriately included in the Company's rate base. Public Staff Engineer Lee recommended that the Ford truck be entirely removed from the rate base on the ground that Glendale does not perform the major repairs to its water systems required for the use of this heavier truck, but contracted this service to Pipeline Utilities, Inc., a nonregulated, affiliated company. Glendale witness, Ray Vernon, testified that only two trucks are currently in use and that these trucks are adequate to service the Company's systems. Former Company President, John Blankenship, on the other hand, testified that the ownership of the large Ford truck, with its large truck bed, was advantageous to Glendale.

When there is contradictory evidence on an issue, the weighing of the evidence and the resolution of the conflict is the sole prerogative of the Commission and a reviewing court may not

substitute its judgment. *Utilities Comm. v. Telephone Co.*, 285 N.C. 671, 208 S.E. 2d 681 (1974). We hold that the Commission's conclusion to include only one-third of the cost of the truck, or $3,583, is supported by findings based on substantial evidence. In fact, the Commission's recognition that there may be times when it is cost justified for the Company to have this truck available is quite fair in light of the evidence presented.

[6] In its second assignment of error, Glendale excepts to the Commission's conclusion that expenditures related to its unsuccessful attempt to expand its service area should be excluded from its cost of service. In our opinion, the Company has failed to specify the manner in which the Commission's exclusion of expenses related to its expansion attempt was unreasonable or unlawful.

These are the pertinent facts: The Company included in its operating expenses $8,730 related to a failed attempt to construct a water system in the Oak Ridge subdivision. Company witness Blankenship opined that the project failed because of the inexperience of the developer. Glendale's nonregulated affiliate, Pipeline Utilities, installs and constructs water systems for the Company. David Moser, vice-president of Pipeline, testified that Pipeline, not Glendale, makes a profit from the construction of these water systems. The cost of construction is paid by the developer of each subdivision. Thus, any profits earned or losses incurred in the construction of water systems such as Oak Ridge, accrue to the developer or some other nonregulated entity, not to the utility. Once the system is operational, the service is contributed to the utility.

Glendale contended that it suffered a substantial financial loss in a contractual dispute with the Oak Ridge developers which led it to seek the abandonment of its franchise in that area. The Company further argued that this loss should be included in its operating expenses on the basis that every expansion indirectly benefits all customers by spreading overhead expenses over a greater number of customers.

Public Staff Accountant, Mike Maness, testified, however, that only after the system is operational and new customers are added are existing customers benefited by the new water system. He further stated that since no profits from the construction of

the water systems flow back to the ratepayers, they should not be required to bear any construction losses.

Based on this evidence, the Commission concluded that

> The construction of the water system in Oak Ridge Subdivision is similar in all respects to the construction of the Company's other water systems, except that it failed. Had it succeeded, the system would have been contributed to the Company. The Commission concludes that the failure of this project does not provide adequate justification for placing the burden of these construction losses upon the ratepayers.

> The Commission also notes that if Pipeline Utilities, Inc., had completed construction of the Oak Ridge system and had incurred a loss upon that construction, the loss would have been borne by Pipeline Utilities, Inc., not by Glendale Water, Inc. The fact that the project was not completed and that a loss was realized does not justify passing the loss on to Glendale and to Glendale's ratepayers.

We hold that the Commission's decision to exclude the $8,730 associated with the Oak Ridge water system construction is supported by substantial evidence and is neither arbitrary nor capricious.

In conclusion, we remand this matter to the Commission with instructions for it to exclude the $1,938 in legal fees, previously included, as a part of Glendale's operating expenses. Although the amount involved might be considered *de minimus*, we feel remand is justified in order to avoid setting incorrect precedent on this important issue concerning the inclusion of legal fees in the rate base calculation of operating expenses. In all other respects, the order of the Commission is affirmed.

Reversed and remanded in part; affirmed in part.

Justice MARTIN dissenting in part and concurring in part.

I dissent as to the majority's holding on the first issue. The Commission found that the service of Glendale was inadequate, both as to water quality and service provided. The litany of Glendale's transgressions against its consumers is set forth in the majority opinion. Not only has Glendale failed to provide proper

service, in at least fifteen of its service areas it does not have the necessary water treatment equipment to render proper service if it were inclined to do so. The evidence concerning the inadequacy of Glendale's service and the danger to the health of its consumers is both overwhelming and uncontradicted. There is no evidence in this record that Glendale has done anything to correct these problems, except to have a witness testify that he was aware of the existing water quality and service problems and that if he were allowed to purchase the controlling stock in the company, he would take corrective measures. There is no evidence that Glendale has acquired a single piece of chlorination equipment for use in the fifteen subdivisions that it serves which have no such equipment. There is no evidence that Glendale has taken any steps to protect the water quality, to improve the water quality, to reduce water outages, to clear the water discoloration, to prevent the staining of fixtures, to provide proper pressure, to reduce the odor of chlorine, to put chlorine in the water when required, to properly maintain the electric wiring, to improve its billing practices, to respond to the customer needs and complaints, and to provide consumers with prompt "boil notices" to warn of contaminated water. In short, Glendale comes before the Commission and this Court asking for the approval of a 14.56 percent increase in rates without any corresponding effort on its part to improve the services to its consumers, who are now being asked to pay additional amounts for the same poor, inadequate service.

I do not find that upon the whole record test the findings of the Commission are adequate or are supported by competent, material, and substantial evidence. N.C.G.S. § 62-94(b)(4), (5), (6) (1982). It is apparent to me that upon this record the decision of the Utilities Commission was arbitrary or capricious.

Prior to the present application, the Commission had established rates for Glendale which were sufficient to enable it to maintain its properties, render proper and adequate service to its consumers, and, in addition, earn a fair return. Glendale must accept responsibility for its actions in allowing its properties to deteriorate and in failing to provide adequate service and water of acceptable quality. Having been granted a monopoly in its franchise area, Glendale is under a duty to render reasonably adequate service. *Utilities Comm. v. Morgan, Attorney General,* 277

N.C. 255, 177 S.E. 2d 405 (1970), *aff'd on reh'g*, 278 N.C. 235, 179 S.E. 2d 419 (1971).

Rates charged by a utility and service rendered go hand in hand:

(a) Every rate made, demanded or received by any public utility, or by any two or more public utilities jointly, shall be just and reasonable.

(b) Every public utility shall furnish adequate, efficient and reasonable service.

N.C.G.S. § 62-131 (1982). The quality of service rendered is a necessary factor to be considered in fixing just and reasonable rates. *Utilities Comm. v. Telephone Co.*, 285 N.C. 671, 208 S.E. 2d 681 (1974). When the Commission found that Glendale's service was inadequate, it was required to make specific findings showing the effect of this inadequacy upon its decision to fix rates fair to both Glendale and the consumer. *Utilities Comm. v. Telephone Co.*, 281 N.C. 318, 189 S.E. 2d 705 (1972). I find no such specific findings. Without such findings the decision of the Commission is arbitrary or capricious. The agency decision does not indicate a fair and careful consideration of the issue, nor does it indicate a course of reasoning and the exercise of judgment. The award of the Commission must be based upon reasoned decision making. *Comr. of Insurance v. Rate Bureau*, 300 N.C. 381, 269 S.E. 2d 547, *reh'g denied*, 301 N.C. 107 (1980).

The Commission had the authority, upon the filing of the application by Glendale, to suspend the hearing pending the improvement of service by Glendale to its consumers. Upon such performance by Glendale, the Commission could then hear and determine the proper rate of return based upon such improved service. In the light of the history of Glendale's performance of its duties as a public utility and its abject failure to provide its consumers with a reliable, potable source of drinking water, the Commission acted arbitrarily or capriciously in relying upon the promises of a witness who was not even the owner of the company but only a person interested in acquiring the company. I find that the Commission erred in granting the increase in rates and vote to have the case remanded to the Commission on this issue, with instructions to vacate the order approving the increased

rates and hold the proceedings of the Commission in suspension until the new owner demonstrates his ability to carry out his promises for improved water quality and service; or, at the very least, for additional findings of fact necessary to support the conclusions of the Commission as being the product of reasoned decision making. Upon this record, the consuming public is entitled to a reliable source of potable drinking water before there should be additional increases in the consumers' costs.

I concur in the remainder of the majority opinion.